UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>U.S. Attorney's Office<br>555 Fourth Street, NW<br>Washington, DC 20530,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>JAMES B. NUTTER & COMPANY<br>(d/b/a NUTTER HOME LOANS),<br>4153 Broadway<br>Kansas City, MO 64111,<br><br>　　　　　Defendant. | Civil Action No. 20-2742<br><br>JURY TRIAL DEMANDED |

## UNITED STATES' COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

INTRODUCTION ................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 5

THE PARTIES ........................................................................................................................ 5

THE FALSE CLAIMS ACT ................................................................................................. 6

FIRREA .................................................................................................................................. 8

FACTUAL ALLEGATIONS ................................................................................................ 8

I.      FHA MORTGAGE INSURANCE PROGRAM. ................................................... 8

        A.      Overview of the FHA Mortgage Insurance Program and the DE
                Program. ................................................................................................... 9

        B.      The FHA HECM Program ....................................................................... 11

        C.      Lenders Must Perform Proper Due Diligence When Underwriting ........ 13

        D.      Lenders Must Submit Truthful Certifications. ....................................... 15

        E.      Lenders Must Use Qualified Underwriters. ........................................... 16

        F.      FHA Requires Lenders to Certify Their Compliance With Their
                Programmatic Responsibilities. .............................................................. 18

        G.      Defaulted HECM Loans Can Result in Claims and Losses to HUD. ...... 22

II.     NUTTER'S PARTICIPATION IN THE FHA PROGRAM. ............................... 24

        A.      Nutter Certified That it Complied With HUD Requirements to Gain
                and Maintain Eligibility in the DE Program. ......................................... 24

        B.      Nutter Certified That its Temporary Contractors Met the
                Requirements to be DE Underwriters to Obtain CHUMS IDs for
                Temporary Contractors. .......................................................................... 25

        C.      FHA Paid Mortgage Insurance Claims on Loans Insured with False
                Certifications by Nutter. ......................................................................... 25

III.    NUTTER APPROVED HECMS FOR FHA MORTGAGE INSURANCE
        WITHOUT THE REVIEW, APPROVAL, AND CERTIFICATION OF A
        QUALIFIED DE UNDERWRITER. ................................................................... 26

A.   Nutter Employees Forged the Signatures of Qualified DE Underwriters ........................................................ 27

B.   Nutter Staff Signed Blank Forms and Certifications that Nutter Used to Approve FHA HECMs .......................................... 31

C.   Nutter Certified and Used Unqualified Temporary Contractors to Underwrite FHA HECMs ........................................ 34

IV.   NUTTER MADE, USED, AND CAUSED TO BE MADE OR USED, FALSE STATEMENTS AND CLAIMS FOR PAYMENT TO HUD. ............... 52

V.   NUTTER'S FALSE CERTIFICATIONS AND STATEMENTS WERE MATERIAL TO HUD AND CAUSED HUD DAMAGES ................................. 53

COUNT I Violation of the False Claims Act 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010) ..................................................... 56

COUNT II Violation of the False Claims Act  31 U.S.C. § 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006)) ........................................ 57

COUNT III Violation of FIRREA, 12 U.S.C. § 1833A, False Loan Certifications to Hud ..................................................... 58

COUNT IV Violation of FIRREA, 12 U.S.C. § 1833A, False DE Underwriter Certifications to Hud .................................... 59

COUNT V Violation of FIRREA, 12 U.S.C. § 1833A, False Annual Certifications to Hud................................................... 60

COUNT VI Breach of Fiduciary Duty............................................................ 60

COUNT VII Breach of Contract...................................................................... 61

PRAYER FOR RELIEF ..................................................................................... 62

## INTRODUCTION

1.      The United States brings this civil action against James B. Nutter & Company (d/b/a/ Nutter Home Loans) ("Nutter") to recover civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, and damages under the common law for breach of fiduciary duty and breach of contract arising from harm sustained by the Department of Housing and Urban Development ("HUD") in connection with Nutter's origination of Home Equity Conversion Mortgage ("HECM") loans underwritten and approved by Nutter and endorsed for Federal Housing Administration ("FHA") mortgage insurance between January 1, 2008, and December 31, 2010 (the "Lending Time Period").  Unless otherwise stated, the United States uses the terms HUD and FHA interchangeably in this Complaint because HUD's HECM insurance operations are conducted through its component, FHA.

2.      FHA's HECM program is a reverse mortgage program specifically designed for senior homeowners age 62 and older.  The program, which allows seniors to access the equity they have built in their homes over the years, is intended to help grow and sustain America's neighborhoods and communities by allowing seniors to remain integral parts of their communities as they age in place in their residences.  The amount of equity a senior can draw out of his or her home through a HECM is limited by the appraised value of the senior's home.

3.      HUD facilitates this important program by offering mortgage insurance on HECMs approved by Direct Endorsement Lenders ("DE Lenders") under rules and requirements established by FHA.  Direct Endorsement Underwriters ("DE Underwriters") are the bedrock and focal point of the FHA program.  HUD requires that a DE Underwriter review every HECM loan endorsed for FHA mortgage insurance and certify that the DE Underwriter has personally reviewed

the appraisal report and that the mortgage complies with HUD requirements and is eligible for FHA mortgage insurance.

4.      During the Lending Time Period, a DE Underwriter's review of a HECM focused on the appraisal of the subject property as the accuracy of the appraisal was essential to the eligibility of the loan offered to the senior.  Because HUD delegates to DE Underwriters the authority to underwrite and approve FHA insured loans without prior review by FHA for compliance with FHA's underwriting requirements, a DE Underwriter must be experienced, trained, knowledgeable, and a fulltime employee of an FHA approved mortgage lender.

5.      While Nutter has participated in the FHA HECM program since the program's inception, and advertises that it originated the very first HECM loan insured by FHA in 1989, the HECM market was drastically expanded by the societal and economic conditions in the mid-2000s. Beginning in early 2007, HECM lenders like Nutter were presented with an opportunity.  With interest rates falling, home values increasing, and Baby Boomers reaching the age of eligibility, the market for HECM loans was robust.  From January 2007 to December 2008, Nutter seized the opportunity and increased its monthly production of HECM loans by more than 700%—from hundreds of loans per month to thousands of loans per month.

6.      With now thousands more HECM loans to underwrite every month, Nutter no longer employed enough DE Underwriters to review and determine whether the HECMs were eligible for FHA insurance.

7.      To compensate, Nutter simply ignored FHA's bedrock for ensuring the soundness of FHA-insured loans and bypassed FHA's underwriter requirements.  Specifically, Nutter:

     a.      Allowed unqualified temporary contractors to underwrite, approve, and sign certifications for HECM loans;

- 2 -

b.     Forged the signatures of qualified underwriters on certifications for other HECM loans;

c.     On still other loans, instructed DE Underwriters to sign blank forms and certifications that represented a DE Underwriter had reviewed and approved the appraisal when, in fact, a DE Underwriter had not; and

d.     Nutter then used these forms and certifications to induce HUD to insure HECM loans that had not been reviewed and approved as required by a DE Underwriter.

8.     Instead of using DE Underwriters who understood the FHA HECM program, the principals of mortgage underwriting, and the responsibilities that come with the authority to approve tax-payer backed mortgage loans, Nutter forged signatures, pre-signed blank certifications, and used temporary contractors to approve FHA-insured loans, some of whom did not even know they were approving mortgage loans, while others knew what they were doing but also knew they were not qualified to do it.

9.     Without a DE Underwriter's professional review and approval of appraisals, Nutter foisted HECM loans on HUD that were both irreparably marred by inflated appraisals and ineligible for FHA mortgage insurance.

10.    Nutter's failure to use qualified DE Underwriters to underwrite FHA loans, and its resulting use of inflated appraisals, allowed it to reap financial benefits from the HECM loans the overvalued properties secured.  To wit, the higher the appraised value Nutter used, the higher the HECM amount Nutter could offer, and the more enticing the HECM loan product appeared to potential senior borrowers.  Moreover, the higher the appraised value used, the higher the HECM amount available, and the higher the origination fee Nutter charged to seniors.

11.     While Nutter financially benefitted from its unqualified or non-existent DE Underwriters' approval of ineligible HECMs with overvalued collateral, FHA and the seniors, families, and communities that FHA serves paid the price.

12.     As a result of Nutter's misconduct, FHA insured overvalued and underwater properties.  During the Lending Time Period, the HECM program was built on an actuarial formula that considered the borrower's age, the property's appraised value, and the interest rate when setting the maximum HECM loan amount FHA will insure.  This formula was written to ensure that upon a HECM borrower's death or default—and the resulting sale or assignment of the property that secured the HECM to recover the funds previously paid to the borrower—FHA would incur minimal insurance claim losses.  Yet because of Nutter's violations of core FHA requirements, FHA paid out tens of millions of dollars in excess claims on hundreds of ineligible and over insured loans that Nutter falsely certified for FHA mortgage insurance.

13.     The senior borrowers were also harmed by Nutter's misconduct.  HECMs secured by an over-valued property necessarily increased the borrower's monthly expenses (insurance and tax payments can increase alongside any purported increase in value), increasing the chance of a default by the senior and potential loss of the home.  And, when a borrower defaulted, an inflated appraisal (and resulting inflated HECM loan amount) increased the amount the borrower would need to redeem the HECM and continue living in the home.

14.     Like the borrowers, their families (especially non-borrowing family members who lived in a senior's home) were harmed when Nutter used inflated appraisals to approve HECMs. Overvalued property inflated the amount a family would have to pay to keep the home in the family in the event of the borrower's death or default.

15.     America's communities suffered as well.  Inflated appraisals result in underwater homes, which drive down property values, decrease liquidity in the mortgage market, and increase defaults, leaving neighborhoods hollowed out by foreclosed and unoccupied homes.

16.     Nutter's decision to approve loans for FHA mortgage insurance endorsement that had not been underwritten and certified by a qualified DE Underwriter, in clear violation of direct FHA requirements, was knowingly made and intended to allow Nutter to approve more FHA loans and earn more money.  Yet the effects of this decision cost the United States tens of millions in false claims and harmed the seniors and communities that FHA intended to benefit.

## JURISDICTION AND VENUE

17.     This action arises under FIRREA, 12 U.S.C. § 1833a, the False Claims Act, 31 U.S.C. §§ 3729-3733, and the common law.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

18.     This Court has personal jurisdiction over Nutter because Nutter transacts business with HUD and borrowers in the District of Columbia.

19.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. §1395, and 31 U.S.C. § 3732(a), because Nutter can be found and transacts business within the District of Columbia.  Nutter transacts business with HUD, which is located in the District of Columbia, and with borrowers.  For example, two of the loans impermissibly underwritten by temporary contractors that resulted in false claims for FHA mortgage insurance (FHA Case Nos. 081-0833543 and 081-0832163) were made to borrowers who are residents of the District of Columbia and secured by property that is within the District of Columbia.

## THE PARTIES

20.     Plaintiff the United States of America, through HUD and its component FHA, promotes American homeownership, including by improving housing standards and conditions,

- 5 -

providing adequate home financing options through insurance of mortgage loans, and stabilizing the mortgage market.

21.     Defendant James B. Nutter & Company (d/b/a/ Nutter Home Loans) is a corporation incorporated under the laws of the State of Missouri.  Nutter originates and underwrites residential mortgage loans for properties in fifty states and the District of Columbia.

## THE FALSE CLAIMS ACT

22.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach all types of fraud, without qualification, that might result in financial loss to the Government.

23.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(A) (2010).

24.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2010).

25.     The False Claims Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(A) (2010).  The False Claims Act provides that no proof of specific intent to defraud is required.  31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2010).

- 6 -

26.     Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(c) (2006).

27.     Effective May 20, 2009, the False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that– (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government– (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A) (2010).

28.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act.

29.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty" for each violation, "plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

### FIRREA

30.     Congress enacted FIRREA in 1989 to reform the federal banking system.  Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate offenses—as established by a preponderance of the evidence—that involve financial institutions and certain government agencies.  *See* 12 U.S.C. § 1833a(e).  Two enumerated predicate offences that form the basis of liability under FIRREA are at issue in this complaint.  First, 18 U.S.C. § 1014 (as amended on July 30, 2008) prohibits any person from "knowingly mak[ing] any false statement or report, or willfully overvalu[ing] any land, property, or security, for the purpose of influencing in any way the action of [FHA]."  Second, 18 U.S.C. § 1006 prohibits any person, who is "connected in any capacity with [HUD]" from "making any false entry in any book, report, or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner, or agent . . . of [a] department or agency of the United States."

31.     FIRREA provides that the United States may recover civil penalties per violation as specified by law.  12 U.S.C. § 1833a(b)(1)-(2); 28 C.F.R. § 85.3(a)(6), (7).  The statute further provides that the penalty can exceed these caps in certain instances, allowing the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  12 U.S.C. § 1833a(b)(3).

### FACTUAL ALLEGATIONS

## I.     FHA MORTGAGE INSURANCE PROGRAM.

32.     Due to its size and to further homeownership opportunities for Americans, the FHA mortgage insurance program necessarily relies on lenders originating and underwriting FHA loans to act responsibly, exercise due care, comply with FHA requirements, and make truthful

certifications.  The description of the FHA Mortgage Insurance Program herein applies to the program today and in the Lending Time Period, except where specified.

A.   **Overview of the FHA Mortgage Insurance Program and the DE Program.**

33.   HUD is a cabinet-level agency of the United States.  Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.  HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

34.   FHA is a part of HUD and is one of the larger mortgage insurers in the world. Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.  FHA provides insurance against losses resulting from borrower default on mortgage loans made under the terms of various loan programs, each with particular characteristics and requirements.

35.   If a borrower defaults on an FHA-insured mortgage, after the completion of certain loss mitigation activities, the holder of the mortgage may eventually submit a claim to HUD for its losses and associated costs.  In paying these insurance claims, FHA reduces the risk of loss faced by the mortgage holder.  The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of FHA's mortgage insurance programs.

36.   A lender must apply to be a DE Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on HUD's behalf. 24 C.F.R. § 203.3.  This is an important responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed."  24 C.F.R. § 203.5(a).  Instead, the DE Lender underwrites mortgage loans on HUD's behalf and determines whether the loan presents, in accordance with HUD's

- 9 -

requirements, an acceptable risk.  In underwriting the mortgage loan, the lender must determine whether the borrower and the mortgage loan meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations."  *Id.*  The DE Lender must decide whether or not to approve the loan for FHA mortgage insurance.

37.     After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by FHA in the event of default.  The DE Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

38.     A DE Lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.  The DE Lender, knowing that the federal insurer is relying on its professional judgment in a business relationship, has an affirmative duty to use due care in providing information and advice to the federal mortgage guarantor.  HUD requires that a DE Lender exercise the same level of care, which it would exercise in obtaining and verifying information for a loan in which the lender would be entirely dependent on the property as security to protect its investment.  *See* 24 C.F.R. § 203.5(c).  As a result, in addition to the regulatory duties addressed below, the DE Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

39.     Put another way, HUD grants DE Lenders responsibility for determining which loans qualify for FHA insurance.  In granting this control and responsibility to the DE Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.  HUD therefore enters into a fiduciary relationship with the DE Lenders.

40.     As a result of this fiduciary relationship, the DE Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD.  These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when originating and underwriting loans for FHA insurance, reviewing the loans for quality control purposes, reporting defective loans, and submitting claims.

**B.     The FHA HECM Program**

41.     DE Lenders, by virtue of the nature of their relationships with HUD and participation in the FHA program, can be approved to originate and underwrite many different types of mortgage loans via the different mortgage insurance programs and products offered by FHA.

42.     The FHA HECM program is a reverse mortgage program specifically for senior homeowners age 62 and older that allows seniors to access the equity in their homes.  The program is designed "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs at a time of reduced income, through the insurance of home equity conversion mortgages to permit the conversion of a portion of accumulated home equity into liquid assets."  12 U.S.C. § 1715z-20(a)(1).

43.     Under the terms of the HECM program, a senior enters into a private mortgage contract and loan agreement with a lender.  In that contract, the borrower agrees to repay the advances made by the lender under the terms of the private mortgage contract, upon the borrower's death, upon the borrower's default on insurance or tax payments, or when the borrower stops residing in the home as the borrower's primary residence.  This private mortgage contract is also non-recourse, meaning that despite the agreement to repay advances, the borrower's liability under the HECM is limited to the value of the property securing the mortgage.  In return, the lender

- 11 -

agrees to make "future payments to the homeowner based on accumulated equity" built in the homeowner's principal residence.   12 U.S.C. § 1715z-20(b)(3).  During the Lending Time Period, the HECM allowed funds to be accessed through one of the below payment options set forth in HUD regulations, *see* 24 C.F.R. § 206.19:

   a.   The *term payment option* allows the homeowner to receive a fixed monthly payment for a fixed term of months chosen by the homeowner;

   b.   The *tenure payment option* allows the homeowner to receive a fixed monthly payment as long as the property is the principal residence of the mortgagor;

   c.   The *line of credit payment option* allows the homeowner to make draws on a line of credit; or

   d.   The *modified* or *modified tenure* plans, which combine the benefits of the term or tenure plans with the line of credit option.

   44.   Regardless of the payment option chosen by the borrower, during the Lending Time Period, the maximum amount of funds a borrower could draw out of the home, known as the principal limit, was determined by a mathematical formula established by HUD that considers "the age of the youngest [borrower], the mortgage interest rate, and the maximum claim amount." 24 C.F.R. § 206.3.  The maximum claim amount is the "lesser of the appraised value of the property, as determined by the appraisal used in underwriting the loan, or the maximum dollar amount for an area established by the Secretary for a one-family residence."  *Id*.

   45.   During the Lending Time Period, a lender's responsibilities when reviewing and approving HECM loans were generally limited to certain discrete tasks, including;

   a.   Ensuring borrower eligibility, such as that the borrower was 62 or over and not delinquent on federal debt;

b.   Ensuring property eligibility, for example, that the property was the borrower's principal residence;

c.   Reviewing and approving the appraisal used to underwrite the loan as discussed more fully below;

d.   Based, in part, on the appraised value, calculating the maximum mortgage insurance claim that could be made to FHA; and

e.   Closing and funding the HECM in accordance with HUD requirements.

**C.   Lenders Must Perform Proper Due Diligence When Underwriting**

46.   A DE Lender is responsible for the mortgage application, the property analysis, and the underwriting of the mortgage.   That responsibility includes performing due diligence and ensuring accuracy of underlying documentation, as it would for the underwriting of any loan.

47.   Proper due diligence is a critical component of the DE Program and any mortgage lending program.   It is required by federal regulation and HUD Handbooks.   It is also required by virtue of the fiduciary duty and duty of reasonable care that the DE Lenders owe to HUD.   *See* Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11,928, 11,932 (Mar. 22, 1983) ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law.").   The entire scheme of FHA mortgage insurance presupposes an honest lender performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found.

48.   In all cases, a DE Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information

- 13 -

for a loan in which the mortgagee would be entirely dependent on the property as security to protect

its investment."  24 C.F.R § 203.5(c).  These regulations further specify:

> The Secretary shall publish guidelines for Direct Endorsement underwriting
> procedures in a handbook, which shall be provided to all mortgagees approved for
> the Direct Endorsement procedure. Compliance with these guidelines is deemed to
> be the minimum standard of due diligence in underwriting mortgages.

49.     In particular, HUD requires DE Lenders to be familiar and fully comply with

governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and

requirements for DE Lenders predicated on sound underwriting requirements.  These requirements

set forth the minimum standard of due diligence in underwriting mortgages with which DE

Lenders must comply.  *Id*.

50.     During the Lending Time Period, and therefore for the HECM loans at issue in this

matter, HUD's underwriting requirements focus almost exclusively on the review the lender

performed of the appraisal used in the loan transaction.

51.     HUD requirements are clear that the DE Lender "is responsible for underwriting

the property and determining that the property is acceptable for mortgage insurance."  HUD

Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.

52.     While HUD requires that an appraiser determine the estimate of appraised value for

all FHA insured loans, it also mandates that DE Lenders "accept responsibility, equally with the

appraiser, for the integrity, accuracy and thoroughness of the appraisal and will be held accountable

by HUD for the quality of the appraisal."  Mortgagee Letter 1994-54.  Accordingly, under HUD's

requirements, "the mortgagee's underwriter is to review the appraisal to determine whether or not

the appraiser's conclusions are acceptable.  If found to be acceptable, the property is eligible for

HUD mortgage insurance." HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; *see also* HUD

Handbook 4155.2, ch. 4.1.b (May 9, 2009).

- 14 -

53.     DE Lenders are "responsible for properly reviewing appraisals and determining if the appraised value used to determine the mortgage amount is accurate and adequately supports the value conclusion."  HUD Handbook 4155.2, ch. 4.1.e.  This review of an appraisal includes verification that the factual information submitted is correctly reported and a determination of the plausibility and consistency of the conclusions based on the data presented in the appraisal.  *See* HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G.

54.     A DE Lender "must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal."  Mortgagee Letter 1994-54.

55.     As discussed above, the appraised value of the property securing a HECM is of the utmost importance because the appraised value of the subject property limits the principal limit available to a borrower and the amount of the HECM loan insured by FHA.  Therefore, when a lender does not perform due diligence underwriting the loan and uses an unsupported, overstated, or inflated appraised value to approve the loan, the principal limit established by the lender exceeds the limits set forth by HUD and renders the loan ineligible for FHA mortgage insurance.

D.     **Lenders Must Submit Truthful Certifications.**

56.     The success of the DE Program and the HECM product depend upon proper underwriting of loan files.  Participating lenders determine the eligibility of borrowers, properties, and loans for FHA insurance, and they ensure the integrity of the data relied upon to make such determinations.

57.     Under the DE Program, HUD relies on the expertise and knowledge of the lenders.

58.     Indeed, as noted below, HUD requires DE Lenders to certify on an annual basis that they are aware of HUD requirements and will fully comply with them.

- 15 -

59.     HUD also relies on the truthfulness of the certification the lender completes on each loan that the loan is eligible for FHA insurance.  As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement."  48 Fed. Reg. at 11,932.

### E.     Lenders Must Use Qualified Underwriters.

60.     "HUD requires that lenders use an FHA-registered underwriter to review and certify mortgage origination documents for compliance with the requirements of the FHA's mortgage insurance program."  FHA Underwriter Registry.  To obtain and maintain its status as a DE Lender, a lender must have qualified underwriters on staff.  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-2.C.

61.     The DE underwriter must assume the following responsibilities:

compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

decisions relating to the acceptability of the appraisal, the inspections, the buyer[']s capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

monitoring and evaluation of the performance of fee and staff personnel used for the [DE] program; and

awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C

62.     Because HUD has delegated to DE Lenders that ability to originate and underwrite loans for FHA mortgage insurance, HUD considers the DE Underwriters that a lender employs to

be "the focal point of the Direct Endorsement program."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.   "The underwriter's role and responsibility are crucial elements of the Direct Endorsement program" because HUD relies on the "Underwriter Certification . . . to endorse the mortgage loan without a detailed technical underwriting review."  *Id.*

63.     Along with its delegating of underwriting decisions to DE Lenders, HUD has also delegated to DE Lenders the authority to give underwriters a Computerized Homes Underwriting Management System ("CHUMS") identification number that allows them to underwrite FHA loans as a DE Underwriter.  A DE Lender approves a DE Underwriter, and obtains the DE Underwriter's CHUMS ID, by communicating information about the underwriter to HUD through FHA Connection, a website maintained by HUD that permits lenders to transmit certain information to HUD about the lender, employed underwriters, and loans approved for FHA insurance.

64.     Principally, a DE Underwriter must be a "reliable and responsible professional skilled in mortgage evaluation."  HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

65.     To qualify as a DE Underwriter an underwriter must satisfy the following requirements.  An underwriter must:

(a)     be "a corporate officer with signatory authority or otherwise authorized to bind the mortgagee in matters involving the origination of mortgage loans;"

(b)     "be employed by only one mortgagee, and [the DE Underwriter] function may not be contracted out by the originating mortgagee;"

- 17 -

(c)      "have a minimum of three years full-time recent experience . . . reviewing both credit applications and property appraisals.  Experience related solely to mortgage credit or appraisal review counts for one-half of the total requirements;" and

(d)       "be a reliable and responsible professional skilled in mortgage evaluation [who] demonstrate[s] his or her knowledge and experience regarding the principles of mortgage underwriting."

HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C.

66.      HUD further requires, the DE Underwriter "nominee's resume must give detailed descriptions of job experiences that demonstrate knowledge of principles, practices, and techniques of mortgage underwriting, including: (1) real estate appraisal, (2) mortgage credit evaluations, (3) factors affecting property values and real estate trends."  *Id.*

67.      HUD specifies that DE Underwriters "may not be independent contractors or contract employees," and requires that all the DE Underwriters' "compensation must be reported on Form W-2."  This is to ensure that the DE Lender has and exercises control of the DE Underwriters approving loans for FHA mortgage insurance because a DE Underwriter's "authority is though the [DE Lender]."   HUD Handbooks 4060.1, REV-2, ch. 2-9.

68.      These requirements serve to ensure that FHA-insured loans are underwritten only by qualified individuals who are knowledgeable about, and experienced with, applicable underwriting requirements and responsible to the DE Lender employing them, who in turn serves as a fiduciary of HUD.

### F.    FHA Requires Lenders to Certify Their Compliance With Their Programmatic Responsibilities.

69.      HUD requires DE Lenders to certify their compliance with the foregoing due diligence and DE Underwriter qualification requirements.

### 1.      Application Certification

70.     First, when a lender applies to participate in the DE Program, the lender must certify

that it will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of
> each loan for insurance or request for insurance benefits, the applicant has and will
> comply with the requirements of the Secretary of Housing and Urban Development,
> which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702
> *et seq.*) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I
> letters and policies with regard to using and maintaining its FHA lender approval.

This certification is submitted to HUD headquarters in the District of Columbia.

### 2.      Annual Certification

71.     If the lender is approved to participate in an FHA program, the lender must re-

certify, every year, that it is complying with the program's requirements, including that is

exercising the required due diligence in underwriting and that it is fully responsible for its own

employees' actions.  From 2007 to 2009, the lender was required to certify:

> I know or am in the position to know, whether the operations of the above-named
> mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify
> that to the best of my knowledge, the above named mortgagee conforms to all
> HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the
> above-named mortgagee is fully responsible for all actions of its employees
> including those of its HUD-FHA approved branch offices.

This language was altered in 2010, requiring the lender to certify:

> I certify that I know, or am in the position to know, whether the operations of above-
> named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters,
> Title I Letters, and policies; and that I am authorized to execute this report on behalf
> of the lender.  I certify that the lender complied with and agrees to continue to
> comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters,
> policies, and terms of any agreements entered into with [HUD].  I certify that to the
> best of my knowledge, the above-named lender conforms to all HUD-FHA
> regulations necessary to maintain its HUD-FHA approval, and that the above-
> named lender is fully responsible for all actions of its principals, owners, officers,
> directors, managers, supervisors, loan processors, loan underwriters, loan
> originators, and all other employees conducting FHA business for the above-named
> lender . . .  Each of my certifications is true and accurate to the best of my
> knowledge and belief.  I understand that if I knowingly have made any false,

- 19 -

fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

These certifications are submitted to HUD headquarters in the District of Columbia.

72.     Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a DE Lender.

### 3.     DE Underwriter Certification

73.     As discussed above, HUD authorizes—and relies upon—DE Lenders to train, qualify, and certify their own employees as DE Underwriters.  In order to obtain a CHUMS ID for an underwriter—and therefore allow the underwriter to approve loans for FHA mortgage insurance on the lender's behalf—a lender must submit certain information about the underwriter to FHA via FHA Connection.  Along with submitting personally identifying information such as the underwriter's name and social security number, the lender must certify that the underwriter "meets all the Department's requirements for being a DE underwriter as found in HUD Handbook 4000.4 Rev-1 Chg 2 paragraph 2-4 and that all information entered on this screen to my knowledge is correct."  FHA Connection Underwriter Registry.  These certifications are submitted to HUD headquarters in the District of Columbia.

74.     Unless the lender submits a truthful certification concerning an employee's qualifications, the lender is not permitted to use that employee to underwrite FHA-insured HECM loans.

### 4.     Loan Level Certifications

75.     For each individual HECM loan approved for FHA insurance, a DE Underwriter employed by the lender must certify to personal review of the appraisal and other supporting

documentation, due diligence in underwriting the mortgage, and the loan's eligibility for mortgage insurance:

> The undersigned Direct Endorsement underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage.  I find that this mortgage is eligible for HUD mortgage insurance . . . I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.[1]

Form HUD-92900-A.

76.      Among the certifications set forth in HUD Handbook 4000.4 is a certification that "the mortgage complies with HUD underwriting requirements as contained in all outstanding HUD handbooks and Mortgagee Letters[.]"  HUD Handbook 4000.4, Appendix 3.

77.      Beyond the loan-level certification that a DE Underwriter must sign on HUD Form-92900-A, HUD requires other loan level certifications be signed by a DE Underwriter.

78.      Particularly relevant in the HECM context, where a DE Underwriter's responsibility is focused on review of the adequacy of the collateral securing the mortgage, "[i]f the property is acceptable for mortgage insurance the [DE Lender] will issue to the applicant FORM HUD-92800.5B Conditional Commitment/Direct Endorsement Statement of Appraised Value."  HUD Handbook 4000.4, REV-1, CHG-2, ch 1-2.A.  On the FORM HUD-92800.5B, a DE Underwriter identifies the estimated value of the property, commits the lender to obtaining FHA mortgage insurance, and signs the form.

79.      Additionally, a DE Underwriter also signs the Direct Endorsement Underwriter / HUD Reviewer Analysis of Appraisal Form, where the DE Underwriter analyzes and comments on the appraisal, validating or correcting the estimate of value set forth on the appraisal.

---

[1]      As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.

80.     Finally, HUD requires a fourth relevant loan level certification. A representative of the lender must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents… I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."   Form HUD-92900-A.   If the loan does not meet all applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement.

81.     Absent completion of truthful Loan Level Certifications described above, the DE Lender cannot approve a HECM loan and submit it for FHA insurance endorsement.

82.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the DE Program.

83.     For DE Lenders, HUD does not generally review or underwrite FHA loans for approval prior to the loan being endorsed for insurance or prior to HUD's payment of a claim for mortgage insurance.  Instead, HUD relies on lenders to comply with its requirements and to ensure that every loan is in fact eligible for FHA insurance.

84.     The certifications are required for each lender to enter and remain in the program. Accurate certifications (i) are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance; (ii) are essential for a claim on a loan to be eligible for FHA insurance; and (iii) are needed to protect HUD and the FHA insurance fund from undue risk and loss.

### G.     Defaulted HECM Loans Can Result in Claims and Losses to HUD.

85.     Once a loan is approved and submitted for endorsement, FHA insures it on the bases that the DE Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance.

- 22 -

86.     It is only because a lender originates a loan for FHA insurance and HUD endorses such loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

87.     During the Lending Time Period, upon the HECM borrower's death, the lender's foreclosure, or other enumerated events set forth in 24 C.F.R § 206.123, mortgage holders "may submit claims for the payment of the mortgage insurance benefits."  24 C.F.R § 206.123(a).

88.     Prior to 2012, HUD utilized the Industrial Automation Control System ("IACS") to administer the HECM program and assist in the processing of claims for mortgage insurance on HECM loans.  In late 2012, HUD established the Home Equity Reverse Mortgage Information Technology ("HERMIT") system for HECMs that allowed HECM mortgagees to file most claims for mortgage insurance electronically.  Certain claim types were still required to be processed on paper.

89.     The HERMIT system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments to paying the claim such as an indemnification agreement.  After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds through wire transfer to the holder of the mortgage note.

90.     Under the IACS and HERMIT systems and regardless of whether the HECM mortgagee submits a claim manually or electronically, the claim for insurance benefits must include certain information set forth in HUD Form 27011 and electronic versions of the same. Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number and the date of the loan's endorsement for FHA insurance.

91.     If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

## II.     NUTTER'S PARTICIPATION IN THE FHA PROGRAM.

92.     Nutter began participating in the HECM program as a DE Lender in 1995.  During the Lending Time Period, Nutter's underwriting of HECM loans was conducted at Nutter's headquarters in Kansas City, Missouri.

### A.     Nutter Certified That it Complied With HUD Requirements to Gain and Maintain Eligibility in the DE Program.

93.     To become and remain a HUD-approved DE Lender, Nutter was required to annually certify its compliance with HUD's requirements.

94.     For example, Len Kuklenski, Nutter's Chief Financial Officer, certified to HUD on April 12, 2010, for fiscal year end ("FYE") 2009 that:

> I certify that [Nutter] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and the terms of any agreements entered into with the Department.

> I certify that to the best of my knowledge, [Nutter] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [Nutter] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators and all other employees conducting FHA business for [Nutter] in all of its offices where it performs any functions of an FHA-approved lender.

95.     Nutter made similar certifications for FYE 2008 and 2010.

96.     As set forth elsewhere herein, the foregoing certifications were knowingly false because Nutter knew, deliberately ignored, or recklessly disregarded that it originated and underwrote loans that were not in compliance with HUD requirements, since it did not ensure that hundreds of loans were underwritten with due diligence and did not ensure that qualified DE Underwriters reviewed and analyzed appraisals.

- 24 -

**B.**   **Nutter Certified That its Temporary Contractors Met the Requirements to be DE Underwriters to Obtain CHUMS IDs for Temporary Contractors.**

97.   To obtain CHUMS IDs for certain temporary contractors, Tera Guy, Nutter's Vice President of Operations, certified that Nutter's temporary contractors met HUD's requirements for DE Underwriters as discussed in greater detail below.

98.   For example, on April 3, 2008, Tera Guy made the following certification to HUD in order to obtain CHUMS ID DA06 for a temporary contractor;

> I certify that the individual meets all of the Department's requirements for being a DE underwriter as found in HUD Handbook 4000.4 Rev-1 Chg 2 paragraph 204 and that all information entered on this screen to my knowledge is correct.

99.   This certification, and others made by Ms. Guy in order to obtain CHUMS IDs for temporary contractors, were false because the individuals were not employed by Nutter, as Nutter contracted out the underwriting function, and did not meet HUD's requirements for DE Underwriters.

**C.**   **FHA Paid Mortgage Insurance Claims on Loans Insured with False Certifications by Nutter.**

100.   Nutter profited from its scheme both by charging fees for originating FHA-insured HECM loans and by selling the holding and servicing rights on such loans to others.

101.   After approving a loan and obtaining FHA insurance, Nutter often sold the holding and servicing rights for the loan to large institutional investors located throughout the United States.

102.   As of 2019, HUD paid claims totaling over $55 million on at least 450 FHA-insured HECM loans that Nutter originated and underwrote that were not reviewed or approved by a qualified DE Underwriter.

103.   Many additional claims are expected on FHA-insured HECM loans endorsed by Nutter that were not underwritten by a qualified DE Underwriter.

- 25 -

### III.    NUTTER APPROVED HECMS FOR FHA MORTGAGE INSURANCE WITHOUT THE REVIEW, APPROVAL, AND CERTIFICATION OF A QUALIFIED DE UNDERWRITER.

104.    Nutter's business model focused on forming relationships with loan correspondents that originated HECM loans.  These loan correspondents would then send HECMs to Nutter for review, underwriting, and FHA endorsement.

105.    In 2007, the market for HECMs was growing.  As the Baby Boomer generation was approaching the age of eligibility for the HECM program, interest rates were falling dramatically, and home values were increasing.

106.    Buoyed by these market conditions, Nutter's loan correspondent partners began sending Nutter more HECM loans to review and underwrite than Nutter could handle.  Rather than turning away this burgeoning business, Nutter welcomed it with open arms—from January 2007 to December 2008, Nutter increased its monthly production of HECM loans by more than 700%, from just over 300 loans in January 2007 to almost 2,200 loans in December 2008.

107.    But Nutter did not have enough DE Underwriters on staff to handle this influx of loans.  Rather than hire and train more qualified DE Underwriters, or recognize that it did not have enough underwriters to handle this influx of loans, Nutter chose to violate FHA requirements in order to approve more loans and make more money.  Specifically, Nutter approved and submitted HECMs for FHA mortgage without the review, approval, and certification of a qualified DE Underwriter.

108.    This misconduct resulted in Nutter underwriting and approving loans that were ineligible for FHA mortgage insurance and that were secured by properties that were significantly overvalued.

109.     Automated Valuation Models ("AVM") provide real estate property valuations using mathematical modeling combined with a database of comparable sales, and calculate a property's value at a specific point in time by analyzing values of comparable properties.

110.     Nutter recognized the important role AVMs can play when analyzing the reliability of an appraisal, as in certain instances, when Nutter was aware that an AVM indicated a property's estimated appraised value was overstated, Nutter instructed its underwriters to use the lower value estimated by the AVM when insuring the loan with FHA.

111.     An analysis of AVMs for properties that secured HECMs that were endorsed for FHA mortgage insurance without the review, approval, and certification of a qualified DE Underwriter reveals that, on balance, the appraised values Nutter used to approve these loans were significantly overstated, and the properties securing these HECMs were significantly overvalued.

112.     The vast majority of loans submitted for FHA mortgage insurance endorsement by Nutter that were not reviewed, approved, and certified by a qualified DE Underwriter were underwritten using an inflated appraised value, which allowed over-valued collateral to secure FHA insured mortgages.

113.     Accordingly, FHA suffered tens of millions of dollars in damages as a result of Nutter approving ineligible loans predicated on inflated appraised values.

**A.     Nutter Employees Forged the Signatures of Qualified DE Underwriters**

114.     Upon review and approval of a HECM loan for FHA mortgage insurance, a DE Underwriter must sign certain requisite documents and certifications evidencing that very review and approval.  Specifically, as discussed above, a DE Underwriter must sign Form HUD-92900-A, Form HUD-92800.5B, and the Direct Endorsement Underwriter/HUD Reviewer Analysis of Appraisal Form.

- 27 -

115.     The DE Underwriter's signature on these forms is required and serves as proof to HUD that a DE Underwriter performed the requisite due diligence on the loan, determined the loan complied with FHA's requirements, and ultimately approved the loan for FHA mortgage insurance.

116.     Nevertheless, Nutter employees routinely forged the signatures of DE Underwriters on these forms without the knowledge or consent of the DE Underwriter whose false signature was affixed to the document.  Specifically, if a loan file was missing the signature of a DE Underwriter on one of these certifications or forms, members of Nutter's HECM Closing or Shipping Departments would forge the signature of a DE Underwriter prior to sending the loan files to HUD or investors who might purchase the mortgage.

117.     By allowing forged signatures of a DE Underwriter, rather than a DE Underwriter's review, Nutter insured unsound and unqualified loans for FHA mortgage insurance.  Nutter allowed appraisals that had not been reviewed by DE Underwriters to support FHA insured loans, and loans that had not been approved by a DE Underwriter to be insured with FHA. Unsurprisingly, many of the appraisals for loans on which Nutter forged the signature of a DE Underwriter overstated and inflated the appraised value of the subject property.

118.     Attached to this complaint as Attachment 1 is a list of loans, with pertinent loan information, where Nutter forged the signature of a DE Underwriter on at least one of the certifications listed above.  This list is not exhaustive, but rather, a list of examples of the false records and certifications Nutter submitted to FHA.  Two examples listed in Attachment 1 are detailed below.

### 1.     *FHA Case Number 137-4568572.*

119.     FHA Case Number 137-4568572 relates to a HECM loan for a property in the State of Illinois.

- 28 -

120.     Nutter underwrote, approved, and endorsed this loan for FHA mortgage insurance on March 18, 2009.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

121.     Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage and did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance.

122.     Documentation and information provided by Nutter to HUD stated that FHA Case Number 137-4568572 was approved by a DE Underwriter with a CHUMS ID of DT01.

123.     However, the signature appearing on Form HUD-92900-A was forged.

124.     DT01 neither signed the Form HUD-92900-A certification by his own hand nor did he provide another individual with his express consent to sign the certification on his behalf.

125.     The appraisal used to underwrite FHA Case Number 137-4568572 significantly overvalued the property securing the HECM loan.

126.     An AVM for the property securing FHA Case Number 137-4568572 indicates that the property's value was $131,000 at or about the time of endorsement.  However, Nutter used an appraised value of $198,000—more than 150% of the value indicated by the AVM—to underwrite the HECM.

127.     When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM, and HUD paid an FHA insurance claim of $137,942.49.

**2.     *FHA Case Number 261-9482000***

128.     FHA Case Number 261-9482000 relates to a HECM loan for a property in the State of Michigan.

- 29 -

129.    Nutter underwrote, approved, and endorsed this loan for FHA mortgage insurance on August 13, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

130.    Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage and did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance.

131.    Documentation and information provided by Nutter to HUD stated that FHA Case Number 261-9482000 was approved by a DE Underwriter with a CHUMS ID of P819.

132.    However, the signatures appearing on Form HUD-92800.5B Conditional Commitment/Direct Endorsement Statement of Appraised Value and the Direct Endorsement Underwriter/HUD Reviewer Analysis of Appraisal Form were forged.

133.    P819 neither signed the certifications on these forms by her own hand nor did she provide another individual with her express consent to sign the certification on her behalf.

134.    The appraisal used to underwrite FHA Case Number 261-9482000 significantly overvalued the property securing the HECM loan.

135.    An AVM for the property securing FHA Case Number 261-9482000 indicates that the property's value was $26,000 at or about the time of endorsement.  However, Nutter used an appraised value of $50,000—almost 200% of the value indicated by the AVM—to underwrite the FHA-insured HECM.

136.    When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM, and HUD paid an FHA insurance claim of $46,232.65.

- 30 -

**B.**     **Nutter Staff Signed Blank Forms and Certifications that Nutter Used to Approve FHA HECMs**

137.     As set forth above, HUD requires the signature and certification of the approving DE Underwriter as proof that the DE Underwriter did, in fact, review and approve the appraisal and loan.

138.     Nutter not only forged signatures of DE Underwriters on loans it endorsed for FHA mortgage insurance.   At Nutter's instruction, DE Underwriters that Nutter employed or temporarily retained by contract signed blank forms and certifications, falsifying the required documentation that they had reviewed the supporting materials and approved the loans when they had not.

139.     This practice allowed appraisals that had not been reviewed to support FHA-insured loans, and loans that had not been approved by a DE Underwriter to be insured with FHA.

140.     Unsurprisingly, many of the loans where Nutter DE Underwriters signed blank forms and certifications were underwritten using appraisals that overstated and inflated the appraised value of the subject property.

141.     Attached to this complaint as Attachment 2 is a list of loans, with pertinent loan information, where Nutter DE Underwriters signed blank forms and certifications stating that the underwriter had reviewed the appraisal or approved the loan before Nutter insured the loan with FHA.  This list is not exhaustive, but rather, a list of examples of the false records and certifications Nutter made or used in dealing with FHA.   Two examples listed in Attachment 2 are detailed below.

**1.     *FHA Case Number 521-6771986***

142.     FHA Case Number 521-6771986 relates to a HECM loan for a property in the State of Utah.

- 31 -

143. Nutter underwrote, approved, and endorsed this loan for FHA mortgage insurance on January 13, 2009. Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

144. Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage and did not comply with HUD rules in reviewing and approving this mortgage for FHA insurance.

145. Documentation and information provided by Nutter to HUD stated that FHA Case Number 521-6771986 was approved by a DE Underwriter with a CHUMS ID of P819.

146. Form HUD-92800.5B Conditional Commitment/Direct Endorsement Statement of Appraised Value contains the signature of P819, and an Action Date of August 25, 2008, indicating that P819 approved the appraisal used to underwrite FHA Case No. 521-6771986 on August 25, 2008. Additionally, the Direct Endorsement Underwriter/HUD Reviewer Analysis of Appraisal Form, also dated August 25, 2008, contains the signature of P819, lists the "appraiser's Estimate of Value was $405,000," and contains a check mark indicating that the underwriter concluded that the "value [is] acceptable for HUD/FHA loan purposes."

147. However, the appraisal used to approve this loan and endorse it for FHA mortgage insurance was not finished and signed by the appraiser until October 28, 2009.

148. The DE Underwriter signatures and certifications on these documents were false as the DE Underwriter did not review and analyze the appraisal used to approve the HECM for FHA mortgage insurance prior to certifying the loan.

149. The appraisal used to underwrite FHA Case Number 521-6771986 significantly overvalued the property securing the HECM loan.

- 32 -

150.    An AVM for the property securing FHA Case Number 521-6771986 indicates that the property's value was $237,000 at or about the time of endorsement.  However, Nutter used an appraised value of $405,000—$168,000 more than the AVM indicated—to underwrite the FHA-insured HECM.

151.    When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM, and HUD paid an FHA insurance claim of $83,413.36.

### 2.    FHA Case Number 291-3836206

152.    FHA Case Number 291-3836206 relates to a HECM loan for a property in the State of Missouri.

153.    Nutter underwrote and approved this loan, and endorsed it for FHA mortgage insurance on September 1, 2009.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

154.    Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage and comply with HUD rules in reviewing and approving this mortgage for FHA insurance.

155.    Documentation and information provided by Nutter to HUD stated that FHA Case Number 291-3836206 was approved by a DE Underwriter with a CHUMS ID of DK43.

156.    Form HUD-92800.5B Conditional Commitment/Direct Endorsement Statement of Appraised Value contains the signature of DK43, and an Action Date of November 26, 2008, indicating that DK43 approved the appraisal used to underwrite FHA Case No. 291-383606 on November 26, 2008.  Additionally, the Direct Endorsement Underwriter/HUD Reviewer Analysis of Appraisal Form, also dated November 26, 2008, contains the signature of DK43, lists the

- 33 -

"appraiser's Estimate of Value was $105,000," and contains a check mark indicating that the underwriter concluded that the "value [is] acceptable for HUD/FHA loan purposes." Finally, Form HUD-92900-A contains the signature of DK43, and indicates the mortgage loan was approved without any conditions on November 26, 2008.

157.    However, the appraisal used to approve this loan and endorse it for FHA mortgage insurance was not finalized, signed and dated by the appraiser until November 28, 2008.

158.    Therefore, the DE Underwriter's signatures and certifications on these documents are false records and false statements as the DE Underwriter did not review and analyze the appraisal used to approve the HECM for FHA mortgage insurance prior to certifying the loan.

159.    The appraisal used to underwrite FHA Case Number 291-3836206, and ostensibly reviewed and approved by the DE Underwriter, significantly overvalued the property securing the HECM loan.

160.    An AVM for the property securing FHA Case Number 291-3836206 indicates that the property's value was $31,000 at or about the time of endorsement.  However, Nutter used an appraised value of $105,000—300% more than the value the AVM indicated—to underwrite the FHA-insured HECM.

161.    When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM, and HUD paid an FHA insurance claim of $53,246.65.

**C.      Nutter Certified and Used Unqualified Temporary Contractors to Underwrite FHA HECMs**

162.     Faced with the opportunity to vastly expand its HECM business, in contravention of clear and direct FHA requirements, Nutter used untrained and unqualified temporary contractors as DE Underwriters.  Through temporary staffing services, including Stivers Staffing Services,

Business Personnel Services, Celebrity Staff, and Pride Staff, Nutter retained the services of at least seven temporary contractors, certified them as DE Underwriters contrary to FHA's requirements, and permitted them to underwrite and approve at least 1,367 loans, which loans are detailed in Attachment 3 to this Complaint.

163.    These temporary contractors did not meet FHA's requirements to work as DE Underwriters underwriting FHA insured mortgages.  Specifically, the individuals did not have sufficient experience reviewing credit applications and property appraisals, did not have requisite knowledge regarding the principles of mortgage underwriting, and were contract employees. Nevertheless, Nutter certified them as DE Underwriters, and gave its temporary contractors CHUMS IDs.

164.    Nutter gave its temporary contractors CHUMS IDs with little to no formal training and minimized the responsibilities that came with obtaining and using a CHUMS ID.

165.    Some of the temporary contractors were not even aware that they were underwriting and approving loans for FHA mortgage insurance, believing instead they were processing loans or performing some rudimentary checklist analysis of a loan file for the presence of certain documents.  Even those temporary contractors who understood they were underwriting and approving loans believed their jobs were to rubber stamp loans rather than analyze and question them.

166.    Moreover, if Nutter conducted any quality control on loans underwritten by temporary contractors, the results were not communicated back to the temporary contractors for quality or training purposes.  Thus, the temporary contractors remained in the dark about FHA requirements, the responsibilities associated with their positions, and the quality and significance of the work they were performing.

- 35 -

167.    Nutter sought out temporary workers deliberately, even favoring them over the experienced underwriters that HUD required.  For example, in January 2008, a financial institution with whom Nutter had done business referred a potential underwriting candidate to Nutter as a possible hire, saying he had "extensive FHA background and knows the 'back end' of mortgage[s] very well."  Tera Guy, Nutter's Vice President of Operations, responded that the candidate looked promising, but expressed skepticism at being able to hire her because of directions from Nutter's namesake, founder and Chairman, James B. Nutter: "The problem with being able to hire experienced people lies [with] Mr. Nutter because he doesn't want to hire [them] on full time; he wants them to be hired through a temp agency."

168.    Nutter's temporary contractors churned through loans, putting HUD on the hook for hundreds of millions of dollars of FHA mortgage insurance predicated on false certifications. The loans these temporary workers purported to underwrite were riskier to HUD and unsound because of the temporary contractors' lack of qualifications, and indeed many, if not most, of the loans relied on unquestioned appraisals that overstated the value of the property that should have guarded HUD against losses on the loan.  All the while, Nutter knowingly and repeatedly lied to HUD about the qualifications and eligibility of its temporary contractors, and their loans.

### 1.    *Nutter Falsely Certified that DA06 met the Requirements to be a DE Underwriter, and Used DA06's False Loan Level Certifications*

169.    On April 3, 2008, three days after an underwriter with CHUMS ID DA06 commenced her contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of Operations certified to HUD that DA06 met the qualifications to be a DE Underwriter, and, based on that certification, DA06 became a DE Underwriter.

170.    However, DA06 was not qualified to be a DE Underwriter because:

a.      She was not employed by only one mortgagee, but rather, by a temporary staffing agency. Nutter contracted out the underwriting function, and she was an independent contractor or contractor employee.

b.      She did not have three years full-time recent experience reviewing both credit applications and property appraisals.

c.      She was neither skilled in mortgage evaluation nor did she have knowledge and experience regarding the principles of mortgage underwriting.  Rather, prior to her assignment at Nutter, DA06 had no experience working with reverse mortgages and no experience underwriting loans.  Moreover, she neither recalls being trained on FHA requirements while at Nutter nor believes that she was qualified to underwrite FHA reverse mortgage loans during the time was contracted to work at Nutter.

171.    DA06 was a temporary contractor at Nutter for approximately 6 months before leaving in late 2008.  DA06 never received a W2 or paycheck from Nutter, and was never hired as an employee by Nutter.

172.    As DA06 was unprepared and unqualified to review appraisals used to support FHA insured HECMs and did not understand that she was approving loans for FHA mortgage insurance when she worked at Nutter.  Therefore, it is no surprise that the vast majority of loans that DA06 approved for FHA mortgage insurance were approved based on overstated and inflated appraised values

173.    For example, FHA Case Number 011-5976450 relates to an FHA-insured HECM loan for a property in the State of Alabama.

- 37 -

a.   DA06 underwrote and approved this FHA-insured HECM loan, and Nutter endorsed it for FHA mortgage insurance on October 30, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

b.   Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

c.   Specifically, DA06 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed DA06 to underwrite, approve, and certify this loan.

d.   The appraisal used to underwrite FHA Case Number 011-5976450, which DA06 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

e.   An AVM for the property securing FHA Case Number 011-5976450 indicates that the property's value was $23,000 at or about the time of endorsement.  However, Nutter used an appraised value of $115,000—500% more than the value indicated by the AVM—to underwrite the FHA-insured HECM.

f.   When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM.  HUD paid an FHA insurance claim of $117,972.84.

174.    DA06 certified at least 473 loans for FHA mortgage insurance during her time as a temporary contractor at Nutter.  As DA06 was not qualified to serve as a DE Underwriter, each of these certifications was false.

### 2.    Nutter Falsely Certified that CX36 met the Requirements to be a DE Underwriter, and Used CX36's False Loan Level Certifications

175.    On February 26, 2008, one day after an underwriter with CHUMS ID CX36 commenced her contract work at Nutter, Tera Guy, Nutter's Vice President of Operations certified to HUD that CX36 met the qualifications to be a DE Underwriter, and based on that certification, CX36 became a DE Underwriter.

176.    However, CX36 was not qualified to be a DE Underwriter because:

a.    She was not employed by only one mortgagee, but rather, by a temporary staffing agency, Nutter contracted out the underwriting function, and she was an independent contractor or temporary employee.

b.    She did not have three years full-time recent experience reviewing both credit applications and property appraisals.

c.    She was neither skilled in mortgage evaluation nor did she have knowledge and experience regarding the principles of mortgage underwriting.  Rather, CX36 was unfamiliar with the FHA program, received inadequate training on the FHA program, and believed, even after she left Nutter, that she had been a loan processor—the same role she had held previously at other mortgage lenders—not an underwriter, the role she was given at Nutter.

177.    CX36 was a temporary contractor at Nutter for approximately three months before leaving in mid-2008.  CX36 never received a W2 or paycheck from Nutter and was never hired as an employee by Nutter.

178.     As CX36 was unprepared and unqualified to review appraisals used to support FHA-insured HECMs, it is no surprise that the vast majority of loans that CX36 approved for FHA mortgage insurance were approved based on overstated and inflated appraised values.

179.     For example, FHA Case Number 241-8043675 relates to an FHA-insured HECM loan for a property in the State of Maryland.

 a. CX36 underwrote and approved this HECM loan, and Nutter endorsed it for FHA mortgage insurance on April 23, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

 b. Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

 c. Specifically, CX36 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed CX36 to underwrite, approve, and certify this loan.

 d. The appraisal used to underwrite FHA Case Number 241-8043675, which CX36 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

 e. An AVM for the property securing FHA Case Number 241-8043675 indicates that the property's value was $34,000 at or about the time of endorsement.  However, Nutter used an appraised value of $93,000—more than 250% of the value indicated by the AVM—to underwrite the FHA-insured HECM.

f.     When the loan defaulted, the proceeds from the sale of the property that secured the

HECM did not cover the funds expended by the lender on the HECM.  HUD paid

an FHA insurance claim of $91,403.37.

180.    CX36 certified at least 22 loans for FHA mortgage insurance during her time as a

temporary contractor at Nutter.  As CX36 was not qualified to serve as a DE Underwriter, each of

these certifications was false.

### 3.     *Nutter Falsely Certified that CZ15 met the Requirements to be a DE Underwriter, and Used CZ15's False Loan Level Certifications*

181.    On March 26, 2008, 13 days after an underwriter with CHUMS ID CZ15 began her

contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of

Operations certified to HUD that CZ15 met the qualifications to be a DE Underwriter, and based

on that certification, CZ15 became a DE Underwriter.

182.    However, CZ15 was not qualified to be a DE Underwriter because:

a.     She was not employed by only one mortgagee, but rather, by a temporary staffing

agency, Nutter contracted out the underwriting function, and she was an

independent contractor or contractor employee.

b.     She was neither skilled in mortgage evaluation nor did she have knowledge and

experience regarding the principles of mortgage underwriting.  Rather, CZ15 was

unfamiliar with the requirements associated with the FHA program, had no

experience underwriting or working with reverse mortgages, and received only two

weeks of on the job training before Nutter instructed her to begin underwriting

HECM loans.

- 41 -

183.   CZ15 was a temporary contractor at Nutter for approximately three months before leaving in mid-2008.  CZ15 never received a W2 or paycheck from Nutter and was never hired as an employee by Nutter.

184.   As CZ15 was unprepared and unqualified to review appraisals used to support FHA insured HECMs, it is no surprise that the vast majority of loans that CZ15 approved for FHA mortgage insurance were approved based on overstated and inflated appraised values.  CZ15 believed that underwriters at Nutter relied on the appraised value provided by the appraiser and did not perform substantive analysis of the reliability of the appraised value used to underwrite the loan.

185.   For example, FHA Case Number 261-9408976 relates to an FHA-insured HECM loan for a property in the State of Michigan.

    a.   CZ15 underwrote and approved this HECM loan, and Nutter endorsed it for FHA mortgage insurance on May 7, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

    b.   Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

    c.   Specifically, CZ15 was not qualified to perform the function of a DE Underwriter.  Nevertheless, Nutter knowingly allowed CZ15 to underwrite, approve, and certify this loan.

d. The appraisal used to underwrite FHA Case Number 261-9408976, which CZ15 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

e. An AVM for the property securing FHA Case Number 261-9408976 indicates that the property's value was $45,000 at or about the time of endorsement.  However, Nutter used an appraised value of $125,000—more than 250% of the value indicated by the AVM—to underwrite the FHA-insured HECM.

f. When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM.  HUD paid an FHA insurance claim of $113,114.32.

186. CZ15 certified at least 439 loans for FHA mortgage insurance during her time as a temporary contractor at Nutter.  As CZ15 was not qualified to serve as a DE Underwriter, each of these certifications was false.

### 4. Nutter Falsely Certified that CV37 met the Requirements to be a DE Underwriter, and Used CV37's False Loan Level Certifications

187. On January 15, 2008, seven days after an underwriter with CHUMS ID CV37 commenced her contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of Operations certified to HUD that CV37 met the qualifications to be a DE Underwriter, and based on that certification, CV37 became a DE Underwriter.

188. However, CV37 was not qualified to be a DE Underwriter because:

a. She was not employed by only one mortgagee, but rather, by a temporary staffing agency, Nutter contracted out the underwriting function, and she was an independent contractor or contractor employee.

- 43 -

b.      She was neither skilled in mortgage evaluation nor did she have knowledge and

experience regarding the principles of mortgage underwriting.  Rather, CV37 was

unfamiliar with the FHA program, had no experience underwriting, and received

only one week of training that did not include reviewing or learning FHA

guidelines.  Moreover, CV37 was surprised how easily she obtained a CHUMS ID

because the process did not require the training she thought it would, and she did

not think she had the experience necessary to get a CHUMS ID when she received

one from Nutter.

189.    CV37 worked as a temporary contractor at Nutter for approximately three months

before leaving in mid-2008.  CV37 never received a W2 or paycheck from Nutter and was never

hired as an employee by Nutter.

190.    As CV37 was unprepared and unqualified to review appraisals used to support

FHA-insured HECMs, it is no surprise that the vast majority of loans that CV37 approved for FHA

mortgage insurance were approved based on overstated and inflated appraised values.

191.    For example, FHA Case Number 491-9105756 relates to an FHA-insured HECM

loan for a property in the State of Texas.

a.      CV37 underwrote and approved this HECM loan, and Nutter endorsed it for FHA

mortgage insurance on March 27, 2008.  Nutter certified that it had performed due

diligence when underwriting the mortgage, that a DE Underwriter had personally

reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

b.      Contrary to Nutter's certifications, Nutter did not use due diligence when

underwriting the mortgage, a qualified DE Underwriter had not reviewed the

- 44 -

appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

c. Specifically, CV37 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed CV37 to underwrite, approve, and certify this loan.

d. The appraisal used to underwrite FHA Case Number 491-9105756, which CV37 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

e. An AVM for the property securing FHA Case Number 261-9408976 indicates that the property's value was $57,000 at or about the time of endorsement. However, Nutter used an appraised value of $95,000—more than 166% of the value indicated by the AVM—to underwrite the FHA-insured HECM.

f. When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM. HUD paid an FHA insurance claim of $55,337.63.

192. CV37 certified at least 37 loans for FHA mortgage insurance during her time as a temporary contractor at Nutter. As CV37 was not qualified to serve as a DE Underwriter, each of these certifications was false.

### 5. Nutter Falsely Certified that DL77 met the Requirements to be a DE Underwriter, and Used DL77's False Loan Level Certifications

193. On August 7, 2008, ten days after an underwriter with CHUMS ID DL77 commenced her contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of Operations certified to HUD that DL77 met the qualifications to be a DE Underwriter, and based on that certification, DL77 became a DE Underwriter. Nutter did not provide DL77 any

- 45 -

underwriter training before she got a CHUMS ID, and Nutter did not train or inform her of the responsibilities associated with a CHUMS ID before Nutter provided her one.

194.    DL77 believes that she was not qualified to underwrite FHA reverse mortgage loans during the time she was contracted to work at Nutter.  Specifically, DL77 was not qualified to be a DE Underwriter because:

    a.    She was not employed by only one mortgagee, but rather, by a temporary staffing agency, Nutter contracted out the underwriting function, and she was an independent contractor or contractor employee.

    b.    She was neither skilled in mortgage evaluation nor did she have knowledge and experience regarding the principles of mortgage underwriting.  Rather, DL77 was unfamiliar with the FHA program, had no experience underwriting or working with HECM loans and was not qualified to be an underwriter.

    c.    She did not have three years' full-time recent experience reviewing both credit applications and property appraisals.

195.    DL77 worked as a temporary contractor at Nutter for approximately six months. DL77 never received a W2 or paycheck from Nutter and was never hired as an employee by Nutter.

196.    The process used by Nutter to underwrite reverse mortgage loans during DL77's assignment was very quick and often resulted in loans being rubber stamped by underwriters at Nutter.  As DL77 was unprepared and unqualified to review appraisals used to support FHA-insured HECMs, it is no surprise that the vast majority of loans that DL77 approved for FHA mortgage insurance were approved based on overstated and inflated appraised values.

197.    For example, FHA Case Number 081-0833543 relates to an FHA-insured HECM loan for a property in the District of Columbia.

- 46 -

a. DL77 underwrote and approved this HECM loan, and Nutter endorsed it for FHA mortgage insurance on October 28, 2008. Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

b. Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

c. Specifically, DL77 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed DL77 to underwrite, approve, and certify this loan.

d. The appraisal used to underwrite FHA Case Number 261-9408976, which DL77 supposedly reviewed and approved by DL77, significantly overvalued the property securing the HECM loan.

e. An AVM for the property securing FHA Case Number 081-0833543 indicates that the property's value was $225,000 at or about the time of endorsement. However, Nutter used an appraised value of $310,000—$85,000 more than the value indicated by the AVM—to underwrite the FHA-insured HECM.

f. When the loan defaulted, the proceeds from the sale of the property that secured the HECM did not cover the funds expended by the lender on the HECM. HUD paid an FHA insurance claim of $280,235.44.

- 47 -

198.    DL77 certified at least 188 loans for FHA mortgage insurance during her time as a temporary contractor at Nutter.  As DL77 was not qualified to serve as a DE Underwriter, each of these certifications was false.

### 6.    Nutter Falsely Certified that DS98 met the Requirements to be a DE Underwriter, and Used DS98's False Loan Level Certifications

199.    On November 14, 2008, three days after an underwriter with CHUMS ID DS98 began her contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of Operations certified to HUD that DS98 met the qualifications to be a DE Underwriter, and based on that certification, DS98 became a DE Underwriter.

200.    However, DS98 was not qualified to be a DE Underwriter because:

a.      She was not employed by only one mortgagee, but rather, by a temporary staffing agency, Nutter contracted out the underwriting function, and she was an independent contractor or contractor employee.

b.      She was neither skilled in mortgage evaluation nor did she have knowledge and experience regarding the principles of mortgage underwriting.

c.      She did not have three years full-time recent experience reviewing both credit applications and property appraisals.

201.    DS98 worked as a temporary contractor at Nutter for approximately six months. DS98 never received a W2 or paycheck from Nutter and was never hired as an employee by Nutter.

202.    DS98 was unprepared and unqualified to review appraisals used to support FHA-insured HECMs.  Prior to being assigned to Nutter, DS98 had never reviewed appraisals to determine the reliability and reasonableness of the estimated value and was unfamiliar with the FHA HECM loan program.  Thus, it is no surprise that the vast majority of loans that DS98

- 48 -

approved for FHA mortgage insurance were approved based on overstated and inflated appraised values.

203.    For example, FHA Case Number 093-6565485 relates to an FHA-insured HECM loan for a property in the State of Florida.

      a.     DS98 underwrote and approved this HECM, and Nutter endorsed it for FHA mortgage insurance on February 24, 2009, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

      b.     Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

      c.     Specifically, DS98 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed DS98 to underwrite, approve, and certify this loan.

      d.     The appraisal used to underwrite FHA Case Number 261-9408976, which DS98 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

      e.     An AVM for the property securing FHA Case Number 081-0833543 indicates that the property's value was $49,000 at or about the time of endorsement.  However, Nutter used an appraised value of $130,000—more than 265% of the value indicated by the AVM—to underwrite the FHA-insured HECM.

- 49 -

f.     When the loan defaulted, the proceeds from the sale of the property that secured the
       HECM did not cover the funds expended by the lender on the HECM.  HUD paid
       an FHA insurance claim of $69,057.02.

204.    DS98 certified at least 124 loans for FHA mortgage insurance during her time as a
temporary contractor at Nutter.  As DS98 was not qualified to serve as a DE Underwriter, each of
these certifications was false.

### 7.     *Nutter Falsely Certified that CU82 met the Requirements to be a DE Underwriter, and Used CU82's False Loan Level Certifications*

205.    On January 4, 2008, one day after an underwriter with CHUMS ID CU82 began
her contract work at Nutter on behalf of her staffing agency, Tera Guy, Nutter's Vice President of
Operations certified to HUD that CU82 met the qualifications to be a DE Underwriter, and based
on that certification, CU82 became a DE Underwriter.

206.    However, CU82 was not qualified to be a DE Underwriter because:

a.     She was not employed by only one mortgagee, but rather, by a temporary staffing
       agency, Nutter contracted out the underwriting function, and she was an
       independent contractor or contractor employee.

b.     She was neither skilled in mortgage evaluation nor did she have knowledge and
       experience regarding the principles of mortgage underwriting.  Rather, CU82 had
       no experience underwriting or working with HECM loans and was unaware that he
       had a personal CHUMS ID assigned to her.

207.    CU82 was a temporary contractor at Nutter for approximately three months.  CU82
never received a W2 or paycheck from Nutter and was never hired as an employee by Nutter.

208.    As CU82 was unprepared and unqualified to review appraisals used to support FHA insured HECMs, it is no surprise that the vast majority of loans that CU82 approved for FHA mortgage insurance were approved based on overstated and inflated appraised values.

209.    For example, FHA Case Number 241-8023759 relates to an FHA-insured HECM loan for a property in the State of Maryland.

a.    CU82 underwrote and approved this HECM, and Nutter endorsed it for FHA mortgage insurance on March 18, 2008.  Nutter certified that it had performed due diligence when underwriting the mortgage, that a DE Underwriter had personally reviewed the appraisal, and that the loan was eligible for FHA mortgage insurance.

b.    Contrary to Nutter's certifications, Nutter did not use due diligence when underwriting the mortgage, a qualified DE Underwriter had not reviewed the appraisal, and the loan did not comply with HUD rules and was ineligible for FHA mortgage insurance as it had not been underwritten by a qualified DE Underwriter.

c.    Specifically, CU82 was not qualified to perform the function of a DE Underwriter. Nevertheless, Nutter knowingly allowed CU82 to underwrite, approve, and certify this loan.

d.    The appraisal used to underwrite FHA Case Number 241-8023759, which CU82 supposedly reviewed and approved, significantly overvalued the property securing the HECM loan.

e.    An AVM for the property securing FHA Case Number 081-0833543 indicates that the property's value was $263,000 at or about the time of endorsement.  However, Nutter used an appraised value of $350,000—$87,000 more than the value indicated by the AVM—to underwrite the FHA-insured HECM.

- 51 -

f.       When the loan defaulted, the proceeds from the sale of the property that secured the

HECM did not cover the funds expended by the lender on the HECM.  HUD paid

an FHA insurance claim of $282,993.06.

210.     CU82 certified at least 14 loans for FHA mortgage insurance during her time as a

temporary contractor at Nutter.  As CU82 was not qualified to serve as a DE Underwriter, each of

these certifications was false.

## IV.    NUTTER MADE, USED, AND CAUSED TO BE MADE OR USED, FALSE STATEMENTS AND CLAIMS FOR PAYMENT TO HUD.

211.     The loans discussed in this complaint and attached hereto are representative

examples of false statements and false claims that Nutter knowingly made, used, or caused to be

made or used to HUD.  The loans are emblematic of the loans Nutter falsely certified for FHA

insurance and are products of the systemic practices and procedures followed by Nutter that led to

the submission of false statements and claims.

212.     For all the loans that have gone to claim at issue in this complaint, HUD paid all of

the claims associated with the loans.  These claims were false because the loans were not eligible

for FHA insurance as Nutter falsely certified that a DE Underwriter had underwritten the loan and

the loan was underwritten using due diligence in accordance with HUD guidelines.

213.     HUD has also issued FHA mortgage insurance on thousands of other loans based

on Nutter's false certifications and statements.  While a claim for FHA mortgage insurance may

not have been made yet, the statements made and used by Nutter to obtain FHA mortgage

insurance were false because the loans were not eligible for FHA mortgage insurance, a DE

Underwriter had not underwritten the loan, and the loan was not underwritten using the due

diligence required by HUD guidelines.

- 52 -

214.     Nutter made false statements regarding the qualifications of temporary contractors it held out as DE Underwriters, causing the United States to suffer tens of millions of dollars of damages when the United States, based on Nutter's false representations, allowed these DE Underwriters to underwrite FHA insured loans.

## V.     NUTTER'S FALSE CERTIFICATIONS AND STATEMENTS WERE MATERIAL TO HUD AND CAUSED HUD DAMAGES

215.     FHA requirements that Nutter violated form the bedrock of the FHA DE program. FHA delegates to qualified underwriters the ability to approve FHA loans; Nutter did not use qualified underwriters.  FHA requires that those underwriters personally review and analyze the loan file; Nutter did not ensure that a DE Underwriter reviewed and analyzed the loan file.

216.     These bedrock requirements, which ensure that loans are sound and compliant with FHA's requirements, are material to FHA's decision to insure a mortgage loan—absent a truthful certification that a qualified DE Underwriter underwrote and approved a HECM, FHA would not insure the HECM.

217.     FHA effectuates its rejection of a loan submitted for insurance under the DE Program by sending a Notice of Return ("NOR") to the DE Lender.  The NOR identifies the reason FHA has rejected the loan.  Specifically delineated reasons that will form the basis for HUD rejecting a loan are listed on the NOR form and include (a) the underwriter who certified the loan was not approved, (b) certifications were missing from the Form HUD-92900-A, and (c) certifications were missing from the Form HUD-92800.5B.

218.     Nutter received NORs during the Lending Time Period, including NORs that indicated the reason HUD was rejecting a loan was because the loan was missing a required certification on the Form HUD-92900-A or Form HUD-92800.5B.  Thus, Nutter knew that if FHA had known that Nutter was using underwriters who should not have been approved, and forging

the signatures of DE Underwriters on key certifications, FHA would not have insured the loans at issue in this action.

219.    Once FHA insures a loan—even if that insurance decision was the result of a lender's false certification—to provide assurances to the investors on the secondary market that provide liquidity to originators, FHA insurance contracts contain an "incontestability" clause that requires HUD to pay insurance claims unless the holder of the mortgage note itself (i.e., the third-party investor) committed fraud.  12 U.S.C. § 1709(e).  HUD's administrative remedy is and was not to cease payment to note holders, but instead to seek indemnification from originators who submitted the false certification for any losses associated with the loan.

220.    HUD's regulations require that a lender "shall indemnify HUD for an insurance claim if the mortgagee knew or should have known fraud or misrepresentation was involved in connection with the origination of the mortgage, regardless of whether the fraud or misrepresentation caused the mortgage default and regardless of when an insurance claim is filed." 24 C.F.R. § 203.255(4).

221.    Additionally, during the Lending Time Period, HUD's internal guidance applied by HUD employees reviewing loans for compliance with FHA requirements called for indemnification when a DE Underwriter did not execute the certification on Form HUD-92900-A, or when the lender did not underwrite the appraisal.

222.    Guided by published regulations and internal guidance, HUD's practice was to require indemnification when a lender did not have a qualified DE Underwriter underwrite and certify a loan, and when a lender misrepresented certain aspects of the loans origination.

223.    Nutter was aware of the gravity and materiality HUD ascribed to its rules and regulations requiring a qualified DE Underwriter's analysis and approval of loans submitted for

- 54 -

FHA insurance.  Nutter's own quality control audits—the results of which, as noted above, were not shared with Nutter's temporary contractors—reveal this simple truth.

224.     Specifically, if a loan file did not contain an executed Form HUD-92900-A evidencing a DE Underwriter's approval and certification of a loan, Nutter's quality control process rated the loan as a "major risk," meaning it may result in "the loan being uninsurable by FHA," or "indemnification exposure by . . . HUD."  A loan containing a "pre-dated" document was also rated as a "major risk" by Nutter because "pre-dating documents" is "not a prudent lending practice . . . as it compromises the integrity of the loan documents."

225.     Even though Nutter was (a) aware that HUD would reject a loan for insurance, or request indemnification if a loan was already insured, if it discovered a DE Underwriter had not approved the loan, or that the loan contained fraud or misrepresentation, and (b) incorporated this understanding of materiality into its own quality control process, Nutter continued forging documents, pre-signing and predating forms, and allowing unqualified temporary employees to approve FHA insured mortgages.

226.     Nutter's misconduct prevented HUD from requiring indemnification, and avoiding damages associated with Nutter's false claims, as it hid from HUD the salient fact that the DE Underwriters it used to underwrite appraisals and loans, and certify them to HUD, were unqualified temporary employees.  Likewise, the forged documents and pre-signed certifications hid from HUD the truth underlying the loan—that a DE Underwriter had not approved or reviewed the loan and its appraisal—and prevented HUD from avoiding damages by requiring Nutter to indemnify HUD for any losses on the loans.

227.     By means of its scheme to endorse loans for FHA insurance without the review and approval of a qualified DE Underwriter, Nutter endorsed risker and unsound HECM loans that,

- 55 -

upon the borrower's eventual default, were more likely to result in HUD paying claims for mortgage insurance.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1) (2006) AND 31 U.S.C. § 3729(A)(1)(A) (2010)

228.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

229.    Nutter violated the False Claims Act, 31 U.S.C. § 3729(a)(1) (2006) and 31 U.S.C. § 3729(a)(1)(A) (2010), by knowingly presenting and causing to be presented to HUD false and/or fraudulent claims for payment.

230.    Specifically, Nutter made, or caused to be made, false claims for FHA insurance payments to be made—which represented compliance with requirements for FHA insurance including, but not limited to origination, underwriting, and endorsement requirements—by originating, underwriting, and submitting HECM loans for FHA mortgage insurance that failed to comply with FHA requirements.

231.    By originating, underwriting, and submitting ineligible mortgages for FHA mortgage insurance Nutter improperly obtained FHA mortgage insurance and fraudulently induced the United States to enter into a mortgage insurance contract that it would not have otherwise entered into, rendering the subsequent claim for mortgage insurance false as a matter of law.

232.    These false claims for FHA mortgage insurance payments were material as they led the Government to make payments that, absent the falsity, it would not have made.

233.    Nutter, through its senior management, had actual knowledge that these claims were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

234.   As a result of the false claims caused by Nutter's improper practices during the Lending Period, the United States was damaged by making insurance payments it would have otherwise not been required to make in an amount to be determined at trial.

235.   The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

**COUNT II**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(A)(1)(B) (2010) (FORMERLY 31 U.S.C. § 3729(A)(2) (2006))**

236.   The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

237.   Nutter violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2010) (formerly 31 U.S.C. § 3729(a)(2) (2006)), by knowingly making, using, or causing to be made or used, false records, or statements material to false or fraudulent claims for payment to HUD and/or  in order to get false or fraudulent claims paid.

238.   Specifically, Nutter falsely represented to HUD that it had complied with requirements for issuing FHA insurance to HECM loans (including, but not limited to origination, underwriting, and endorsement requirements) when in fact it had not.

239.   These false statements were material to false claims for FHA insurance payments on loans that Nutter failed to originate, underwrite, and submit for FHA mortgage insurance endorsement in accordance with FHA requirements.

240.   Nutter's false statements were material to these false claims as they had a natural tendency to influence and were capable of influencing the Government to make payments that, absent the falsity, it may not have made.

241.     Nutter, through its senior management, had actual knowledge that its statements were false or acted with deliberate ignorance or reckless disregard as to their falsity as evidenced, in part, by the facts described above.

242.     As a result of Nutter's false statements during the Lending Time Period, the United States was damaged by making insurance payments it would have otherwise not been required to make in an amount to be determined at trial.

243.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT III
### VIOLATION OF FIRREA, 12 U.S.C. § 1833A,
### FALSE LOAN CERTIFICATIONS TO HUD

244.     The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

245.     By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD mortgage insurance in violation of 12 U.S.C. § 1833a, for each of the loans endorsed for FHA mortgage insurance by Nutter but not reviewed by a qualified DE Underwriter—due to Nutter's forging of certifications, signing of blank forms, or use of unqualified temporary contractors—Nutter knowingly made, used, or caused to be made or used, false and fraudulent records, statements, or certifications and submitted such false and fraudulent records, statements, and certifications to HUD in violation of 18 U.S.C. §§ 1006 and 1014 (as amended).

246.     Nutter (a) made statements to HUD/FHA with the intent to deceive HUD into providing mortgage insurance (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing FHA (18 U.S.C. § 1014, as amended).

- 58 -

247.     Accordingly, for each of the loans Nutter originated, underwrote, and submitted for FHA mortgage insurance that was not reviewed by a qualified DE Underwriter, Nutter is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## COUNT IV
## VIOLATION OF FIRREA, 12 U.S.C. § 1833A,
## FALSE DE UNDERWRITER CERTIFICATIONS TO HUD

248.     The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

249.     By virtue of the acts described above, and for the purpose of fraudulently obtaining HUD approval of its unqualified temporary contractors as DE Underwriters, Nutter knowingly made, used, or caused to be made or used, false certifications and submitted such false certifications to HUD in violation of 18 U.S.C. §§ 1006 and 1014 (as amended).

250.     Nutter (a) made statements to HUD with the intent to deceive HUD/FHA into granting DE Underwriter authority to Nutter's temporary contractors (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing FHA (18 U.S.C. § 1014, as amended).

251.     The false DE Underwriter certifications submitted by Nutter deceived HUD into granting DE authority to unqualified temporary contractors, and resulted in HUD insuring over 1,400 loans, and paying insurance claims in excess of $50 million on loans approved by the unqualified DE Underwriters.

252.     Accordingly, for each false DE Underwriter certification it submitted to HUD, Nutter is liable for losses to HUD and civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

- 59 -

**COUNT V**
**VIOLATION OF FIRREA, 12 U.S.C. § 1833A,**
**FALSE ANNUAL CERTIFICATIONS TO HUD**

253.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

254.    By virtue of the acts described above, and for the purpose of fraudulently maintaining HUD approval as an FHA mortgagee and DE Lender, Nutter knowingly made, used, or caused to be made or used, false annual certifications stating that Nutter had complied with all HUD-FHA requirements, when, in fact, it had not.  Nutter submitted such false certifications to HUD in violation of 18 U.S.C. §§ 1006 and 1014 (as amended).

255.    Nutter (a) made statements to HUD with the intent to defraud or deceive HUD into maintaining Nutter's approval as a DE Lender (18 U.S.C. § 1006); and (b) knowingly made false statements for the purpose of influencing FHA (18 U.S.C. § 1014, as amended).

256.    The false annual certifications submitted by Nutter between 2008 and 2010 influenced HUD into maintaining Nutter as a DE Lender, and resulted in HUD insuring thousands of loans underwritten by Nutter in those years.

257.    Accordingly, for each false certification it submitted to HUD, Nutter is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**

258.    The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

259.    As a DE Lender, Nutter is a fiduciary of HUD and owes HUD fiduciary duties.

- 60 -

260.     As a fiduciary of HUD, Nutter has a duty to act for, and give advice to, HUD for the benefit of HUD as to whether particular loans should be endorsed for FHA insurance under the DE Program.

261.     As a fiduciary of HUD, Nutter owes HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in its dealings with HUD.  These duties require, among other things, that Nutter (1) refrain from making misrepresentations to HUD; (2) make full and fair disclosures of all material facts to HUD; and (3) use reasonable care to avoid misleading HUD or abusing HUD's trust.  Nutter must therefore exercise integrity, prudence, candor, and due diligence on behalf of HUD when certifying DE Underwriters and endorsing loans for FHA insurance.

262.     As set forth above, Nutter breached its fiduciary duties to FHA and HUD.

263.     As a result of these breaches, HUD has paid insurance claims and incurred losses relating to hundreds of FHA-insured loans wrongfully endorsed by Nutter.

## COUNT VII
## BREACH OF CONTRACT

264.     The United States repeats and re-alleges the allegations contained in Paragraphs 1 to 227 above, as if fully set forth herein.

265.     Nutter entered into a contract with HUD for each loan that it endorsed for FHA mortgage insurance.

266.     Under the terms of that contract, Nutter represented it complied with, and obligated itself to comply with, FHA origination, underwriting, and other insurance requirements.

267.     Nutter breached its obligations by failing to comply with these FHA requirements.

268.     Nutter's breach caused FHA to make FHA insurance payments it was not obligated to make.

269.    As a result of these breaches, HUD has paid insurance claims, and incurred losses, relating to hundreds of FHA-insured loans wrongfully endorsed by Nutter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America prays for judgment against the Defendant as follows:

A.    As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against Nutter, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as required by law per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.    As to Count III through V under FIRREA, 12 U.S.C. § 1833a, against Nutter for civil penalties up to the maximum allowed by law per violation, or the amount of gain to Nutter, or, if greater, the amount of the loss to HUD stemming from such conduct;

C.    As to Count VI, the Government is entitled to money damages;

D.    As to Count VII, the Government is entitled to money damages; and

E.    Such other relief as the Court deems just and proper.

THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division, U.S. Attorney's Office


By: _____ */s/ Brian P. Hudak* _____
        BRIAN P. HUDAK
        Assistant United States Attorney
        555 Fourth Street, NW
        Washington, DC 20530
        (202) 252-2549

JAMIE ANN YAVELBERG
SARA MCLEAN
CHRISTOPHER R. B. REIMER
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
(202) 305-3829

*Attorneys for the United States of America*

Dated:  September 25, 2020