# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:20-00874-CV-RK |
| JAMES B. NUTTER & COMPANY, | ) |
| Defendant. | ) |

## ORDER

Before the Court is Defendant's motion to dismiss. (Doc. 33.) The motion is fully briefed. (Docs. 34, 44, 50.) For the reasons set forth below, the motion is **DENIED**.

## I.   Background[1]

Plaintiff filed a seven-count complaint under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733 (Counts I and II); under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"); 12 U.S.C. § 1833a (Counts III, IV, and V); and for common law breach of fiduciary duty and breach of contract (Counts VI and VII). The action concerns alleged fraud in Defendant's endorsement of the Federal Housing Administration's ("FHA") Home Equity Conversion Mortgages ("reverse mortgages" or "HECM" mortgages) from January 1, 2008 to December 31, 2010 (the "Lending Time Period"). Plaintiff's allegations are summarized below.

### A.   FHA Mortgage Insurance Program and the Direct Endorsement Program

The FHA mortgage insurance program relies on lenders originating and underwriting FHA loans to act responsibly, exercise due care, comply with FHA requirements, and make truthful certifications. FHA provides insurance to mortgage holders against losses associated with mortgage loans made under the terms of various FHA loan programs, each with particular characteristics and requirements. If the holder of an FHA-insured mortgage suffers loss, the holder of the mortgage may submit a claim to FHA. In paying these insurance claims, FHA reduces holders' risk of loss.

---

[1] On review of the record, the Court finds Plaintiff's argument in response to Defendant's motion to dismiss persuasive. Portions of Plaintiff's brief, including the Background, are adopted without further reference.

A lender must apply to be a Direct Endorsement ("DE") Lender and must be approved by HUD to underwrite FHA-insured mortgage loans on behalf of the U.S. Department of Housing and Urban Development ("HUD"). HUD does not review applications for mortgage insurance before the mortgage is executed pursuant to the Code of Federal Regulations. Instead, the DE Lender underwrites mortgage loans on HUD's behalf and determines whether the loan presents, under HUD's requirements, an acceptable risk. The DE Lender must certify that the loan meets all of HUD's requirements, and HUD relies on this certification to endorse the loan for FHA insurance. DE Lenders charge fees for originating FHA-insured loans, and they also sell the holding and servicing rights on such loans to others.

1. **The FHA HECM Program**

The FHA HECM program, a reverse mortgage program for senior homeowners that allows them access to the equity in their homes, is designed "to meet the special needs of elderly homeowners by reducing the effect of the economic hardship caused by the increasing costs of meeting health, housing, and subsistence needs[.]" 12 U.S.C. § 1715z-20(a)(1).

To obtain a HECM, a senior citizen (the "borrower") enters into a private mortgage contract and loan agreement with a lender. In that contract, the borrower agrees to repay the advances made by the lender under the terms of the private mortgage contract, upon the borrower's death, upon the borrower's default on insurance or tax payments, or when the borrower stops residing in the home. The borrower's liability under the HECM is limited to the value of the property securing the mortgage. In return, the lender agrees to make "future payments to the homeowner based on accumulated equity" in the home. 12 U.S.C. § 1715z-20(b)(3).

During the Lending Time Period, the maximum amount of funds a borrower could draw out of the home, known as the principal limit, was determined by a formula established by HUD that considered the age of the borrower, the mortgage interest rate, and the appraised value of the home. As part of underwriting a HECM, HUD required a lender to review and approve the appraisal used to underwrite the loan. That is, while HUD required an appraiser estimate the appraised value of the loan, it also mandated that DE Lenders "accept responsibility, equally with the appraiser, for the integrity, accuracy and thoroughness of the appraisal and [ ] be held accountable by HUD for the quality of the appraisal." The underwriter must "review the appraisal to determine whether or not the appraiser's conclusions are acceptable" per HUD protocol.

2

### 2. Lenders Must Use Qualified Underwriters

HUD requires that lenders use an FHA-registered underwriter to review and certify mortgage origination documents for compliance with the requirements of the FHA's mortgage insurance program. A DE Lender must have qualified underwriters on staff, and the underwriter must assume specifically designated responsibilities. Because HUD has delegated to DE Lenders the ability to originate and underwrite loans, the DE Underwriters that a lender employs are the focal point of the DE program. The underwriter's role and responsibility are crucial elements because HUD relies on the Underwriter Certification to endorse the mortgage loan without a detailed technical underwriting review.

A DE Underwriter must be a "reliable and responsible professional skilled in mortgage evaluation" per the HUD handbook. HUD's specific requirements for DE Underwriters include: (a) that the underwriter be an employee, not a contractor, of the lender; and (b) that the underwriter "have a minimum of three years full-time recent experience . . . reviewing both credit applications and property appraisals." These requirements ensure that FHA-insured loans are underwritten by qualified individuals who are knowledgeable about, and experienced with, applicable underwriting requirements and responsible to the DE Lender employing them, who in turn serves as a fiduciary of HUD.

To obtain a Computerized Homes Underwriting Management Identification ("CHUMS") number for an underwriter—and therefore allow the underwriter to approve loans for FHA mortgage insurance on the lender's behalf—a lender must submit certain information about the underwriter to FHA. In so doing, the lender must certify that the underwriter meets all the Department's requirements for being a DE Underwriter and that all information entered into FHA's system is true and accurate. Unless the lender submits a truthful certification concerning an employee's qualifications, the lender may not use that employee to underwrite FHA-insured HECM loans.

Further, for each individual HECM loan approved for FHA insurance, a DE Underwriter employed by the lender must certify to personal review of the appraisal and other supporting documentation, due diligence in underwriting the mortgage, and the loan's eligibility for mortgage insurance per HUD protocol. The endorsement paperwork for an FHA loan must include a host of specific and important certifications by the DE Underwriter.

### 3. Defaulted HECM Loans Can Result in Claims and Losses to HUD

Once a loan is approved and submitted for endorsement, FHA insures it on the bases that the DE Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance. It is only because a lender originates a loan for FHA insurance and HUD endorses such loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses. When HUD receives insurance claims, it verifies that the HECM is FHA-insured before paying them.

### B. Defendant's Alleged Fraud on the FHA HECM Program

Defendant began participating in the HECM program as a DE Lender in 1995. To become and remain a HUD-approved DE Lender, Defendant annually certified its compliance with HUD's requirements, including during the Lending Time Period. Additionally, Defendant made certifications to HUD to obtain CHUMS IDs for certain people it sought to make underwriters. Lastly, Defendant submitted loan-level certifications on numerous HECMs it endorsed for FHA insurance during the Lending Time Period, with the signature of a purported DE Underwriter attesting that he or she "personally" reviewed the loan file. FHA paid out millions of dollars of insurance claims on loans Defendant endorsed during this period. A multitude of these claims involved false certifications. Defendant profited from its FHA-insured lending activities from the origination fees it charged and the sale of holding and servicing rights.

### 1. Defendant's Employees Allegedly Forged the Signatures of Qualified DE Underwriters

DE Underwriters must sign certain requisite documents and certifications evidencing their review and approval of HECMs for FHA mortgage insurance. Nevertheless, Defendant routinely forged the signatures of otherwise qualified DE Underwriters on these forms without the knowledge or consent of the DE Underwriter whose false signature was affixed to the document. At times, if a form was missing a DE Underwriter signature, members of Defendant's HECM Closing or Shipping Departments would forge the signature in the loan file. On other occasions, Defendant had its DE Underwriters sign blank forms, allowing it to fill in appraised values after the fact. As a result, FHA insured loans supported by appraisals that had not been reviewed and that had not been approved by a DE Underwriter. Many of the appraisals for these loans overstated and inflated the appraised value of the property. The Complaint details certain examples of forged signatures and blank-signed forms and includes lists of affected loans.

## 2. Defendant Allegedly Certified and Used Unqualified Temporary Contractors to Underwrite FHA HECMs

Faced with the opportunity to vastly expand its HECM business, Defendant used unqualified temporary contractors as DE Underwriters in contravention of clear and direct FHA requirements. Through temporary staffing services, including Stivers Staffing Services, Business Personnel Services, Celebrity Staff, and Pride Staff, Defendant retained the services of at least seven temporary contractors, certified them as DE Underwriters contrary to FHA's requirements, and permitted them to underwrite and approve more than 1,000 loans. These temporary contractors did not meet FHA's requirements to work as DE Underwriters underwriting FHA-insured mortgages. Specifically, the contractors did not have sufficient experience reviewing credit applications and property appraisals, did not have requisite knowledge regarding the principles of mortgage underwriting, and were temporary contractors. Nevertheless, Defendant certified them as DE Underwriters and gave its temporary contractors CHUMS IDs.

Defendant gave its temporary contractors CHUMS IDs with little to no formal training and minimized the responsibilities that came with obtaining and using a CHUMS ID. Some of the temporary contractors were not even aware that they were underwriting and approving loans for FHA mortgage insurance, believing instead they were processing loans or performing some rudimentary checklist analysis of a loan file for the presence of certain documents. Others understood they were underwriting and approving loans but believed their jobs were to rubber stamp loans rather than analyze and question them. Moreover, if Defendant conducted any quality control on the loans, the results were not communicated back to the temporary contractors for training purposes. Thus, the contractors remained in the dark about FHA requirements, their responsibilities, and the quality and significance of their work.

Defendant sought out temporary workers deliberately, even favoring them over the experienced underwriters that HUD required. For example, in January 2008, a financial institution with whom Defendant had done business referred a potential underwriting candidate to Defendant as a possible hire, saying he had "extensive FHA background and knows the 'back end' of mortgage[s] very well." Tera Guy, Defendant's Vice President of Operations, responded that the candidate looked promising, but noted directions from Defendant's namesake, founder, and Chairman, James B. Nutter: "The problem with being able to hire experienced people lies [with]

5

Mr. Nutter because he doesn't want to hire [them] on full time; he wants them to be hired through a temp agency."

Defendant's temporary contractors' actions put HUD on the hook for hundreds of millions of dollars of FHA mortgage insurance predicated on false certifications. The loans these temporary workers purported to underwrite were riskier to HUD and unsound because of the temporary contractors' lack of qualifications, and indeed many, if not most, of the loans relied on unquestioned appraisals that overstated the value of the property that should have guarded HUD against losses on the loan. All the while, Defendant knowingly and repeatedly lied to HUD about its temporary contractors and their loans. The Complaint details examples and attaches a 34-page list of affected loans.

### 3. Defendant Knew the Significance of its Wrongful Conduct

In addition to pleading facts that Defendant knew it was retaining unqualified underwriters and knew that it was forging signatures and asking underwriters to sign blank forms, Plaintiff additionally pled facts showing that Defendant knew its conduct was materially impermissible. For example, numerous loans originated by Defendant were rejected by HUD because the underwriter appearing on the loan's paperwork had not been approved by HUD or because forms or certifications were missing. As such, Defendant was aware that HUD viewed as important the requirements to have qualified certified underwriters complete and execute loan paperwork.

Additionally, although the "Incontestability Clause" of FHA mortgage insurance contracts prevented FHA from refusing to pay insurance claims, FHA was able to, and did, seek indemnification from lenders on loans it identified as being ineligible for FHA insurance. Guided by published regulations and internal guidance, HUD's practice was to require indemnification when a lender did not have a qualified DE Underwriter underwrite and certify a loan, and when a lender misrepresented certain aspects of the loan's origination. Defendant was aware of this as it created its own internal quality control program styled off of HUD's indemnification practices. Defendant's quality control process rated loans as having a "major risk"—meaning it may result in the loan being uninsurable by FHA or pose indemnification exposure—if loan-level documents were not genuine, *e.g.*, if documents were "pre-dated." Nonetheless, Defendant continued its practices of forging and pre-signing loan certifications.

## II. Legal Standards

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed for

"failure to state a claim upon which relief can be granted." A complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Generally, the Court "accept[s] the allegations contained in the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party." *Cole v. Homier Dist. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). The principle that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions, however. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a complaint states a claim, the Court looks at two factors. First, the Court must identify the allegations that are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678. In other words, to state a claim, a complaint must plead more than "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Id.* at 678. Second, the Court must determine whether the complaint states a plausible claim for relief, which is more than a "mere possibility of misconduct." *Id.* at 679. This step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The Court must review the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* When faced with alternative explanations for the alleged misconduct, the Court may exercise its judgment in determining whether Plaintiff's conclusion is the most plausible or whether it is more likely that no misconduct occurred. *Id.* at 681-82.

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "This particularity requirement demands a higher degree of notice than that required for other claims, and is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 739 (8th Cir. 2020) (quoting *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 888 (8th Cir. 2003)) (internal quotation marks omitted). To satisfy the particularity requirement, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)). "Put another way, the claim must identify who, what, where, when, and

7

how." *United States ex rel. v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citing *Costner*, 317 F.3d at 888) (internal quotation marks omitted).

III. Discussion

  A. False Claims Act: 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B)

The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Here, Plaintiff alleges Defendant violated both 31 U.S.C. §§ 3729(a)(1)(A) (Count I) and 3729(a)(1)(B) (Count II).

As to Count I, the FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). "The FCA is not concerned with regulatory noncompliance. Rather, it serves a more specific function, protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money." *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 739 (8th Cir. 2020) (citation omitted). "Accordingly, the FCA generally attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Id*. The first element of a § 3729(a)(1)(A) claim, often referred to as the "presentment requirement," requires a plaintiff to allege with particularity that the defendant presented, or caused to be presented, a claim for payment or approval. *Id*. When a plaintiff alleges that a defendant engaged in a systematic practice or scheme of submitting fraudulent claims, the plaintiff is not required to "allege specific details of *every* alleged fraudulent claim forming the basis of [their] complaint." *Id*. However, the plaintiff must provide "sufficient details to enable the defendant to respond specifically and quickly" to their allegations that the defendant presented false claims for payment or approval. *Id*. (citation omitted). A plaintiff can satisfy this requirement "by pleading (1) representative examples of the false claims, or (2) the particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id*.

As to Count II, the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." § 3729(a)(1)(B); *Benaissa*, 963 F.3d at 741. The elements of a § 3729(a)(1)(B) claim are: "(1) the defendant made a false record or statement; (2) the defendant knew the statement was false; (3) the statement was material; and (4) the statement made a claim for the government to pay money or

8

forfeit money due." *Id*. (citation omitted). There is no "presentment" requirement for a § 3729(a)(1)(B) claim. However, Plaintiff must "plead a connection between the alleged fraud and an actual claim made payable to the government." *Id*.

Defendant argues the two FCA claims must be dismissed under Rules 12(b)(6) and 9(b) because the complaint fails to allege falsity, materiality, causation, and scienter. As to falsity, Defendant claims Plaintiff did not allege Defendant submitted factually false claims and rather that the Government is pursuing a theory of legal falsity. Specifically, Defendant claims the complaint (1) does not adequately allege Defendant used unqualified DE Underwriters, (2) does not adequately allege Defendant's DE Underwriters failed to use due diligence when underwriting loans, (3) does not adequately allege false certifications that are actionable under the FCA, and (4) does not state a claim because false signatures are irrelevant when the underlying statement is true. As to materiality, Defendant claims insufficient allegations as to Notices of Returns, the "incontestability" clause, and cites Plaintiff's admission it did not pursue available administrative actions. As to causation, Defendant claims the claim fails to show how its allegedly unqualified underwriters were the "material element and substantial factor" as to why the inflated appraisals were not detected during the underwriting process or how inflated appraisals were the foreseeable outcome of the alleged misconduct. As to scienter, Defendant claims the certifications alleged were not false, and that even if they were, Defendant's interpretation of rules, regulations, and guidance was reasonable.

In response, Plaintiff argues it sufficiently alleged the "who, what, where, when, and how" of its FCA claims. Plaintiff argues Defendant's arguments as to falsity are without merit because the complaint sufficiently alleges misleading half-truths, forged signatures, and other actionable false records or statements. Plaintiff further argues *inter alia* the complaint alleges that FHA rules required not only that the Defendant "control" the underwriters but also that the DE Underwriters be employees of Defendant and that Defendant's DE Underwriters were mere temporary contractors; that Defendant's DE Underwriters lacked requisite experience in violation of the HUD handbooks and 24 C.F.R. § 203.5(c); that Plaintiff pled Defendant's unqualified contractors' beliefs as evidence of scienter; that the complaint does not state FCA claims based on false annual certifications as Defendant argues. As to materiality, Plaintiff contends Defendant's argument asks the Court to weigh evidence prematurely, that misrepresentations, which involved falsified signatures and false representations about compliance, are adequately alleged, and that any

9

argument that HUD failed to exercise a remedy is without merit.  As to causation, Plaintiff argues recovering statutory penalties does not require proof that the alleged false claim or statement caused the Government damages, and the complaint supports a plausible inference that Plaintiff's conduct foreseeably resulted in HECMs based on inflated property values and increased risk of loss to FHA.  As to scienter, Plaintiff argues its detailed allegations concerning knowledge were adequately pled because the complaint included detailed allegations of corporate pressure, forged signatures, the hiring of temporary contractors, and other allegations.

After review, the Court finds that Plaintiff sufficiently alleges the "who, what, where, when, and how" of Defendant's alleged misconduct.  As to Count I, the pleadings allege with specificity how Defendant "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval."  As to Count II, the pleadings allege with specificity that Defendant "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim."  Plaintiff's allegations as to falsity, materiality, causation, and scienter, are sufficient to survive dismissal.

### B. Financial Institutions Reform, Recovery and Enforcement Act: 12 U.S.C. § 1833a(a)

FIRREA authorizes the United States to recover civil penalties for the violation of, or conspiracies to violate, certain specified criminal statutes, including 18 U.S.C. § 1006 and 18 U.S.C. § 1014.

Section 1006 proscribes the making of false statements in connection with HUD's operations. Specifically, this provision makes it a crime for any person who is "connected in any capacity with [HUD]" to "make[] any false entry in any book, report or statement of or to [HUD]" with the "intent to" "deceive any officer, auditor, examiner, or agent . . . of [a] department or agency of the United States." § 1006.  To plead a cause of action, Plaintiff must allege: (1) the defendant is a covered person; (2) the defendant knowingly made a false entry in a book, report, or statement submitted to HUD; and (3) the person acted unlawfully and intended to injure, defraud, or deceive HUD. *See United States v. Davis*, 953 F.2d 1482, 1495 (10th Cir. 1992); 8th Cir. Crim. Jury Instr. 6.18.1006A.

Section 1014 prohibits submitting false records or making false statements to the FHA. Specifically, Section 1014 makes it a crime for any person to "knowingly make[] any false statement or report, or willingly overvalues any land, property or security, for the purpose of

10

Case 4:20-cv-00874-RK   Document 55   Filed 06/14/21   Page 10 of 14

influencing in any way the action of [FHA]." *Id.* Thus, to plead a cause of action under this section, Plaintiff must allege: (1) defendant knowingly and willfully made a false statement to one of the listed entities; (2) defendant knew that the statement was false when they made it; and (3) defendant made the false statement for purposes of influencing the entity. *See United States v. Alexander*, 679 F.3d 721, 726 (8th Cir. 2012).

Plaintiff alleges Defendant violated FIRREA in three counts: (1) false certifications to obtain CHUMS IDs for unqualified, temporarily contracted DE Underwriters (Count III); (2) false loan-level certifications that HECMS were reviewed by a DE Underwriter, when in fact the signatures were forged or pre-signed or the signatory was not qualified to be a DE Underwriter (Count IV); and (3) false annual certifications to HUD to maintain approval as a DE Underwriter (Count V).

Referencing its arguments under the FCA, Defendant again argues Plaintiff failed to plead fraudulent intent and failed to plead the alleged false statements were material.

As to fraudulent intent, Plaintiff responds that the complaint adequately alleges "intent to defraud" under § 1006 and that Defendant does not dispute scienter under § 1014. Plaintiff argues the complaint includes numerous allegations of knowing, voluntary conduct with a natural tendency to injure HUD. Plaintiff cites its allegations of Defendant's false representations about the unqualified, temporarily contracted staff Defendant held out as DE Underwriters to whom HUD issued CHUMS IDs, which allow these individuals to endorse loans for FHA insurance despite the fact that they did not meet HUD's requirements. Plaintiff also cites its allegations of falsified signatures and other misrepresentations on loan-level certifications that tended to cause HUD to insure loans that would not otherwise have been insured. As to materiality, Plaintiff argues that neither §§ 1006 nor 1014 contain an express materiality requirement and that to the extent a requirement may be read into one of the statutes, Plaintiff more than sufficiently pled materiality.

After review, the Court agrees with Plaintiff that its allegations survive dismissal as to the FIRREA claims. As noted above, Plaintiff sufficiently pled fraud; additionally, the Court agrees with Plaintiff that to the extent materiality is a required element, which an issue the Court need not decide at this juncture, the complaint sufficiently alleges Defendant's misrepresentations went to the core of its role as a DE Lender.

### C. Breach of Contract and Breach of Fiduciary Duty

A breach of contract claim has four elements: "(1) the existence of an enforceable contract; (2) the presence of mutual obligations under the contract; (3) the failure to perform an obligation specified in the contract; and (4) damages." *In re Luebbert*, 987 F.3d 771, 779 n.4 (8th Cir. 2021) (citing *Sch. Dist. of Kansas City v. Bd. of Fund Comm'rs*, 384 S.W.3d 238, 259 (Mo. Ct. App. 2012)).

Defendant argues Plaintiff fails to allege damages, "relies on only self-serving conclusory allegations that it would not have paid those claims in the absence of the alleged breach" (Doc. 34 at 39), and fails to plead how the alleged breach caused damages.

Plaintiff responds in part that the complaint extensively describes how Defendant's breaches resulted in the approval of HECMs where the appraisal had not received appropriate review by qualified DE Underwriters, correlating with inflated property values and increased risk of loss to FHA. Plaintiff points to allegations that Defendants disregarded HECM program requirements, including the experience requirements for DE Underwriters reviewing appraisals and the requirement that DE Underwriters are to perform a substantive review of the appraisal before approving an HECM to protect FHA from risk of loss. Plaintiff alleges Defendant did not provide the protections it agreed to provide.

The Court finds the allegations sufficiently allege the existence of an agreement, the presence of mutual obligations, the failure to perform an obligation, and damages. In short, Plaintiff plausibly pled the claim of breach of contract.

### D. Breach of Fiduciary Duty

Defendant argues Missouri state law applies to the claim of breach of fiduciary duty while Plaintiff argues federal common law applies. In Missouri, a claim for breach of fiduciary duty has four elements: (1) the existence of a fiduciary relationship between the parties; (2) a breach of that fiduciary duty; (3) causation; and (4) harm. *Lafarge N. Am., Inc. v. Discovery Group L.L.C.*, 574 F.3d 973, 983 (8th Cir. 2009) (citing *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 411 (Mo. Ct. App. 2000)).

Relying on Missouri law, Defendant argues this claim should be dismissed because Plaintiff "fails to establish that Nutter is a fiduciary of HUD" in that the FHA Program "did not create a dominant-subservient relationship" because it subjected the company to "numerous rules and supervision." Doc. 34 at 41 (citing *Dibrill v. Normandy Assocs.*, 383 S.W.3d 77, 86 (Mo. Ct.

12

App. 2012)). In response, Plaintiff argues that its claim is brought under federal common law, not Missouri law, and there is no requirement of subservience.

The distinction is not material here. That is because under federal law, "[w]hether a fiduciary relationship exists is determined by looking to state law." *Larson v. Burlington N. & Santa Fe Ry.*, No. 01-527(RHK-RLE), 2002 WL 47005, at *15 (D. Minn. Jan. 10, 2002) (citing *Davis v. Merrill Lynch*, 906 F2d 1206, 1215 (8th Cir. 1990); *see also United States v. Applied Pharm. Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999) (where there is no federal subject and no reason to suppose the state common law would be inconsistent with federal interests, federal law should properly look to state common law for a rule of decision).

To establish a fiduciary duty under Missouri law, a plaintiff must satisfy five elements:

> (1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance;
> (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party;
> (3) there must be a surrender of independence by the subservient party to the dominant party;
> (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and
> (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

*Chmieleski v. City Products Corp.*, 660 S.W.2d 275, 294 (Mo. Ct. App. 1983). However, absent these elements, a fiduciary relationship may still arise as a matter of law by virtue of the parties' relationship or as a result of the special circumstances of the parties' relationship, such as when "one person relies upon and trusts the other with the management of his property and attendance of his business affairs." *Renaissance Acad. for Math & Sci. of Mo., Inc. v. Imagine Sch., Inc.*, 4:13-CV-00645-NKL, 2014 WL 3828558, at *2 (W.D. Mo. Aug. 4, 2014) (citing *Shervin v. Huntleigh Securities Corp.*, 85 S.W.3d 737, 740-41 (Mo. Ct. App. 2002)).

Here, the Court finds Plaintiff's allegations survive dismissal because the relevant question here is not whether Plaintiff subjected Defendant to numerous rules and supervision and oversight; the question is whether Plaintiff was "so inexperienced and 'ignorant' of the day-to-day operations" of Defendant that it heavily relied on its "expertise and influence." *See Renaissance*,

13

2014 WL 3828558, at *3.  At this juncture, Plaintiff has stated a claim of breach of fiduciary duty applying Missouri's definition of fiduciary duty.

IV. **Conclusion**

Accordingly, and for the reasons set forth above, Defendant's motion to dismiss is **DENIED**.

    **IT IS SO ORDERED.**

s/ Roseann A. Ketchmark  
ROSEANN A. KETCHMARK, JUDGE  
UNITED STATES DISTRICT COURT

DATED:  June 14, 2021